**Peter V. CIGNETTI, III, Plaintiff,**

v.

**Robert W. HEALY, Michael P. Gardner, Kevin J. Fitzgerald, Walter J. Ellis, John J. Gelinas, Gerald R. Reardon, Jeffrey W. Ashe, Thomas F. Cahill and City of Cambridge, Defendants.**

**C.A. No. 96–11427–MEL.**

United States District Court, D. Massachusetts.

May 22, 1997.

George C. Deptula, George C. Deptula, P.C., Boston, MA, for Plaintiff.

Joan M. Griffin, Casner & Edwards, Boston, MA, Arthur J. Goldberg, City Hall, Law Department, Cambridge, MA, for Defendants.

LASKER, District Judge.

Peter Cignetti, a Captain in the Cambridge Fire Department, brings this action under 42 U.S.C. § 1983, claiming that the Cambridge Fire Department ("CFD") and the City of Cambridge engaged in a pattern of retaliation and coercion against him in violation of his first amendment right to free expression on matters of public interest. The City of Cambridge and eight individual defendants move for dismissal of the claims against them pursuant to Fed.R.Civ.P. 12(b)(6).

The motion is granted in part and denied in part.

I.

The facts alleged in the Complaint are taken as true:

Cignetti has been employed by the CFD for 16 years, and currently holds the rank of Captain. He considers himself to be "a vocal representative of the Cambridge Firefighter's Union," serving as a representative to a number of CFD and civic committees.[1] He alleges that over the course of his 16 years at the CFD, he has frequently come into conflict with defendants Robert Healy, Cambridge City Manager; Michael Gardner, Personnel Director of the City; Kevin Fitzgerald, Chief of the CFD; and Walter Ellis, Assistant Chief of the CFD:

> over issues involving the benefits, safety, and welfare of fire-fighters. For example, differences relative to Department Staffing

1. Cignetti has served as a member of the Union's Executive Board; Chaired the Joint City/Union Fire Department Committee on Health and Safety; served on the union's Joint Review Committee, Grievance Committee, Protective Clothing Committee, Public Relations Committee and Bargaining Committee; and has served as an alternate/delegate to both the International Association of Fire Fighters Convention. He is the Trustee of the City's Health and Welfare Fund representing Public Safety Personnel. Cignetti is the Fire Department/Union representative to the City's Employee Assistance Program and also serves as a delegate for the union to the Professional Fire Fighters of Massachusetts. Cignetti has also been active in civic affairs, and has been President of the local parent-teacher's organization, treasurer for the Fitzgerald After School program, a member of the North Cambridge Affordable Housing Committee, the Railroad Safety Committee, and the North Cambridge Stabilization Committee.

Levels, City Wide Risk Levels, District Boundaries, Conditions of Fire Stations, Equipment and Apparatus, the Filing of Injury Reports, Health Care Policy Issues, Domestic Partnership Issues, Civil Service Issues, Collective Bargaining Issues ... [among others].

Moreover, Cignetti has voiced criticism of City Manager Healy's plans to develop the toxic-waste site known as the "W.R. Grace Site," which is situated near Cignetti's home in Cambridge.

Cignetti contends that the defendants, together with the City of Cambridge,

"punish[ed him] for speaking out in connection with his duties and as a citizen of Cambridge," and "threatened [him] on several occasions with transfer as a punishment for plaintiff's taking a number of the positions described [in the Complaint]."

In July 1993, two events led to disciplinary proceedings against Cignetti. First, on July 7, 1993, Cignetti took an engine and a ladder company out of service under circumstances in which he and his subordinate, Lt. Jeffrey Ashe, quarreled as to who was in command of the company.

Second, on July 13, 1993, Cignetti failed to report to the Harvard Science Center to relieve the previous shift, which was responding to a bomb threat. According to Cignetti, he did report "ready if needed to respond" but, due to a miscommunication, never received an order to respond.

Sometime around July 17, 1993, Defendants Chief Fitzgerald and John Gelinas preferred multiple departmental disciplinary charges against Cignetti on account of the July 7 incident. On or about July 26, 1993, Defendant Chief Fitzgerald preferred departmental disciplinary charges against Cignetti relating to the July 13 incident.

Cignetti denied the charges. However, after negotiating with his superiors at the department, he followed Union counsel's advice to settle the matter by accepting a three day suspension and a letter of reprimand, to be expunged after one year.

Despite the settlement reached on the July 7 and July 13 incidents, Cignetti claims that on July 31, 1993

Fitzgerald ... violated the agreement ... by publishing to all fire department personnel a General Order falsely stating that Plaintiff ... had without just cause left a large area without fire protection of EMS coverage, and that Plaintiff ... had shown a lack of good judgment, a complete lack of leadership, and total disregard for the members of his company.

Considering the publication of the General Order as a violation of the settlement, Cignetti appealed it to City Manager Healy, and retained private counsel.

On August 17, 1993, after the settlement at the departmental level fell apart, Cignetti's counsel, in preparation for future disciplinary proceedings, requested in writing that Chief Fitzgerald produce the documents relating to the July 7 and 13 incidents, including the General Order, Murphy's report, and master tapes of communications on those dates. Cignetti contends that during the CFD's delay of nearly a year in turning over those tapes and documents the defendants "maliciously" altered the audio tapes which would have exonerated Cignetti of all wrong-doing.

On August 31, 1993, several weeks after Cignetti appealed the General Order to Healy, Healy stated that the City was "contemplating ... suspension [of Cignetti] without pay for up to six months and/or demotion in rank ..." on account of the July 7 and 13 incidents. At that point, believing that the City and the CFD were not acting in good faith, Cignetti agreed to the City's referral of the matter to the Civil Service Commission.

A hearing was conducted before an Administrative Law Judge of the Massachusetts Civil Service Commission over the course of several days in 1994 and 1995. According to the affidavit of Harold Lichten, who represented Cignetti at the hearing, the ALJ limited the scope of the proceeding to the issue whether disciplinary action was justified for the July 7 and 13 incidents, ruling that "she was interested only in hearing about the events of July 7 and July 13 themselves."

Ashe, Gelinas, Reardon, Cahill, and Fitzgerald testified at the ALJ hearing, and according to Cignetti, "willfully misrepresen-

**14**

ted, in [their] sworn testimony, the events of July 7 and 13." [2]

In the midst of these events, Cignetti underwent surgery for hand injuries on October 14, 1994. He was pronounced fit for limited duty on April 24, 1995, and served until September 8, 1995 when he was placed on involuntary sick leave. Despite written assurances from doctors that Cignetti was fit for limited duty, neither Healy, Gardner, Fitzgerald, nor Ellis allowed Cignetti to return to work until after the matter was put in arbitration on August 22, 1996—a full 11 months later. Cignetti was officially permitted to return to work on September 15, 1996.

## II.

The Complaint alleges that the defendants and the City of Cambridge are liable under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act, M.G.L. ch. 12 §§ 11 H & I, as well as the common law torts of abuse of process and libel.

On this Motion to Dismiss, defendants contend that the individual defendants enjoy absolute immunity either as witnesses or prosecutors (or both) for the acts complained of, and that in any event, the complaint alleges insufficient facts to support Cignetti's claims with regard to any of them.

The City argues that, (1) assuming each of the individual defendants to be immune from suit, the plaintiff suffered no constitutional injury, and accordingly, no cause of action exists against it under either § 1983 or M.G.L. c. 12 §§ 11 H & I, and (2) the action is res judicata and (3) is barred by the statute of limitations.

Cignetti responds that the individual defendants, and therefore the City, are not immune from suit, since the individual defendants were, at the relevant times, not acting as witnesses or prosecutors but rather in administrative and investigatory capacities. Moreover, he argues that res judicata does not apply because the earlier decision of the

ALJ did not rule on the subject matter of his present civil rights claims. Finally, he asserts that the complaint was timely filed.

## III.

*Immunity*

The common law provides absolute immunity to a witness against any claim arising from his testimony. Absolute immunity applies also to the acts of a prosecutor committed in his prosecutorial capacity. Section 1983 does not change the rule: "It does not authorize a damages claim against private witnesses on the one hand, or against judges or prosecutors in the performance of their perspective duties on the other." *Briscoe v. LaHue*, 460 U.S. 325, 335, 103 S.Ct. 1108, 1115–16, 75 L.Ed.2d 96 (1983). The same rules apply to those who prosecute or appear as witnesses in administrative proceedings. *Butz v. Economou*, 438 U.S. 478, 512–13, 98 S.Ct. 2894, 2913–14, 57 L.Ed.2d 895 (1978).

In determining whether prosecutorial immunity applies, the test is "the nature of the function performed, [rather than] identity of the actor who performed it." *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

Ashe, Gelinas, Reardon, Cahill, and Fitzgerald contend that they are entitled to absolute immunity as to the testimony they gave at the Civil Service Commission hearing. As the discussion above indicates, they are correct. A witness is absolutely immune from liability under § 1983 as to claims based on the testimony given at a judicial or administrative proceeding, even if the testimony is knowingly and intentionally perjurious, as is the claim here.

However, the immunity of those defendants as witnesses does not protect them from liability as to Cignetti's claim that their testimony was part of a conspiracy consisting of the testimony and other non-testimonial acts. *Malachowski v. City of Keene*, 787

2. Healy, Gardner and Ellis did not testify, but according to Cignetti, "knew or should have known that sworn testimony was given by City witnesses which willfully and maliciously misrepresented the events which occurred on July 7 ... and July 13." Healy, Gardner, and Ellis "knew

or should have known that the 'composite' tape introduced into evidence by the City against Plaintiff was willfully and maliciously altered and edited to misrepresent events which occurred on July 7 ... and July 13."

F.2d 704, 712 (1st Cir.1986). Accordingly, the Complaint must be examined to determine if the allegations as to their non-testimonial acts states a claim under § 1983. That question is discussed below.

Certain defendants also make claims that they are entitled to immunity in their "prosecutorial" capacities. Defendants' memorandum claims that Healy is entitled to "absolute immunity based upon his prosecutorial role as City Manager;" that Gardner, Fitzgerald, Ellis, and Gelinas are entitled to absolute immunity because "to the extent that [they] are alleged to have had anything to do with the preferring of charges against Cignetti, they also acted as part of the prosecutorial role of the appointing authority." Finally, Healy, Gardner, Fitzgerald, and Ellis assert that they are entitled to absolute immunity for any actions taken in connection with Cignetti's sick leave dispute because they were "part of the prosecutorial function that ultimately culminated in an Arbitration that settled on the eve of the hearing."

■ The question whether a particular defendant is entitled to prosecutorial immunity turns on whether his acts were performed as a prosecutor, or merely as a participant in administrative and investigative functions and activities, as Cignetti alleges. The facts currently of record are not sufficient to permit a finding that all or any of their actions are immune.

*Res Judicata*

■ The City, and the individual defendants, rely upon *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), in asserting that, because of the ruling of the ALJ in the prior proceeding, Cignetti's claims are barred by res judicata. In *Elliott,* the plaintiff employee claimed that his termination was the result of race discrimination. The Court ruled that "when a state agency 'acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts … must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's courts." *El-*

*liott,* 478 U.S. at 789, 106 S.Ct. at 3221, (internal citations omitted).

The facts in *Elliott* were significantly different from those in the case at issue. In *Elliott,* the ALJ "allowed [the plaintiff] to present, as an affirmative defense, evidence that the charges against him were actually motivated by racial prejudice and hence not a proper basis for his discharge." *Id.* at 791, 106 S.Ct. at 3222. Moreover, Elliott's hearing continued intermittently over a period of more than five months, and involved the testimony of more than 100 witnesses, and the submission of at least 150 exhibits. The Supreme Court not surprisingly concluded that the plaintiff had been afforded adequate opportunity to litigate the issue whether discrimination played a role in his termination.

In contrast, in the proceedings before the ALJ, Cignetti was not given an adequate opportunity to litigate the issues raised by his present § 1983 claim. According to the affidavit of Harold Lichten, unchallenged on this point, the ALJ rejected Cignetti's attempts to introduce evidence of bad faith of the defendants:

> she was interested only in hearing about the events of July 7 and 13 themselves. In that regard, she declined to issue subpoenas to [Healy and Gardner, who were] Mr. Cignetti's principal witnesses on the issue of bad faith. She also declined to let Steve Cain[, Cignetti's audio-tape expert,] testify.

The ALJ's comments that she found "no evidence of animosity toward Cignetti by any members of the [CFD]," and that the CFD "comported itself properly," were made without consideration of the present allegations that the defendants' acts were in bad faith, and consequently should either be regarded as dicta or, in any event, not as res judicata.

In short, res judicata does not prevent Cignetti from seeking redress for alleged wrongs which he was not permitted to litigate in the administrative proceedings.

*Statute of Limitations*

The City argues that the Complaint should have been filed by August 31, 1996, three years from the date that Healy announced that he was contemplating disciplinary action against Cignetti. The Complaint was filed

within the statute of limitations, on July 15, 1996. The City's argument mistakes the filing date of the First Amended Complaint, November 7, 1996, for that of the original Complaint in this case.

*Sufficiency of the Complaint*

Defendants and the City argue that Cignetti failed to allege sufficient facts to state a claim for all counts against them. Each claim is discussed in turn.

*Count I:* Violation of 42 U.S.C. § 1983

A) Did Cignetti's Statements Concern Matters of Public Concern?

■ Cignetti alleges that he was punished for making statements about matters of public concern, in violation of his first amendment rights. Defendants argue that the Complaint fails to allege such a claim because, according to them, his expression was solely on matters of private, rather than public, concern.

"Criticism of internal workplace policies ... is not protected speech when it is primarily intended to affect the internal workings of the agency." *Broderick v. Roache,* 751 F.Supp. 290, 293, n. 8 (D.Mass.1990), citing *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). However, "the right of a public employee to engage in speech on matters of public concern without fear of retaliation by his employer is clearly established." *Broderick,* 751 F.Supp. at 292. "Whether the speech pertains to a matter of public concern must be determined by the content, form and context of a given statement." *Id.* at 293.

Although some of the expression for which Cignetti alleges he was punished, particularly that concerning staffing levels and repair of equipment, may involve issues of purely internal interest, other issues upon which Cignetti made public statements, such as the development of the W.R. Grace site and the extending of benefits to gay and lesbian partners, can only be construed as issues of public concern since, as in *Broderick,* these statements criticized City policy on matters which affected public safety. *Board of County Commissioners v. Umbehr,* — U.S. —, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (garbage collector's criticisms of County, Board of Commissioners deemed matter of "public concern"); *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (public employee's private political remark while on duty matter of "public concern"); *see, e.g., Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (teacher's speech on need for extra school funding a matter of "public concern").

B) The Sufficiency of the Allegations As to the Respective Defendants

■ The complaint alleges that after Cignetti's surgery in October 1994, Healy, Gardner, Fitzgerald, and Ellis, together punished Cignetti for his activism by "plac[ing him] on involuntary sick leave of absence ... despite written doctors' assurances that he was fit for limited duty assignments." The Complaint also alleges that Cahill, "rather than providing the original master audio tapes as requested by plaintiff, ... recorded over them," and that Gelinas and Fitzgerald "preferred charges against Plaintiff concerning the July 7th incident," despite their alleged knowledge that Cignetti's actions did not warrant such discipline. These allegations are sufficient to state a claim that Healy, Gardner, Fitzgerald, Ellis, Gelinas, and Cahill retaliated against Cignetti for exercising his right to make statements on "matters of public concern."

■ The Complaint does not, however, allege sufficient facts to state a claim against Ashe and Reardon. The sole relevant allegation against Ashe is that he:

willfully misrepresented in [his] sworn testimony, events which occurred on July 7, 1993; contradicted [himself] and [others] during [his] sworn testimony; knew or should have known that the 'composite' tape introduced as evidence by the City against [Cignetti] was willfully and maliciously altered and edited to misrepresent events which occurred on July 7, 1993.

(Compl. at 11–12).

As to Reardon, the Complaint alleges only that he was in possession of the composite tape for a period of time, and that Reardon:

willfully misrepresented, in his sworn testimony, events which occurred on July 13, 1993; [and] knew or should have known that the 'composite' tape introduced as evidence by the City against [Cignetti] was willfully and maliciously altered and edited to misrepresent events which occurred on July 7 and July 13, 1993.

(Compl. at 12).

These charges are not sufficient to state a claim under § 1983 because they relate solely to statements made as witnesses in the Civil Service hearing, as to which Ashe and Reardon are entitled to absolute immunity. The Complaint is therefore dismissed as to defendants Ashe and Reardon.

*Count II:* Massachusetts Civil Rights Act

■ The Massachusetts Civil Rights Act protects individuals from interference "by threats, intimidation or coercion" with the exercise of "rights secured by the constitution or laws of the commonwealth." M.G.L. ch. 12 §§ 11 H and I. The Complaint alleges that "Healy, through his agents, including Fitzgerald and Ellis, has used threats of violence, coercion, and intimidation against Plaintiff" to chill Cignetti's constitutionally protected right to speak on matters of public concern. Cignetti claims that Ellis "threatened [him] on several occasions with transfer as punishment"; that "[p]laintiff was actually transferred and eventually forbidden to come to work for almost a year"; and that Richard Rossi, Healy's deputy, "made threats of violence against [Cignetti] on at least three occasions."

Defendants contend that the Complaint does not allege violation of a protected right under the MCRA. As discussed above, Cignetti's allegations of retaliation implicate rights secured by the constitution—namely, the right of government employees to speak on matters of public concern—within the meaning of the MCRA.

Defendants next argue that Cignetti's MCRA claim must be dismissed because the allegations do not include any threat of physical harm. Relying on a recent decision of the SJC, *Planned Parenthood League of Massachusetts, Inc. v. Blake,* 417 Mass. 467, 631 N.E.2d 985 (1994), defendants argue that

"the threat of physical harm is a necessary element under a State civil rights claim, notwithstanding federal district court cases to the contrary." (Mem. in Supp. at 10.) In *Planned Parenthood,* the SJC stated that the MCRA:

> was enacted in response to deprivations of secured rights by private individuals using violence or [MCRA] was violated *have involved actual or potential physical confrontations* involving a threat of harm. *Redgrave v. Boston Symphony Orchestra, Inc.,* 399 Mass. 93, 95, 502 N.E.2d 1375 (1987), for example, involved potential threats to the physical safety of the audience and the symphony players.

*Id.* at 473–74, n. 8, 631 N.E.2d 985 (emphasis supplied).

Though *Planned Parenthood* specifies that an MCRA claim must "involve" some "actual or potential physical confrontations," its decision in *Redgrave,* to which *Planned Parenthood* refers, suggests a very loose and commodious definition of the statutory terms. To be specific, in *Redgrave,* the SJC regarded the "physical confrontation" requirement to have been satisfied solely on the testimony of several BSO agents that Redgrave's performance "would implicate the physical safety of the audience ... because of disruptions which BSO agents perceived as quite possible given the community reaction to her political views." *Id.* at 95, 502 N.E.2d 1375. In other words, the SJC found that a threat of physical harm existed, even though the physical harm was not alleged to have been threatened by either party, but rather by third persons who contacted the BSO.

In the case at hand, Rossi's three alleged "threats of violence" clearly involve "potential physical harm" towards Cignetti and are sufficient to support the allegation of a violation of plaintiff's rights under the Massachusetts Civil Rights Act.

*Count III:* Claims Against the City of Cambridge

Count three alleges that the City of Cambridge "maintained an unconstitutional practice of punishing and intimidating employees who spoke out on issues of concern to the City and showed a deliberate indifference to

their First Amendment rights," and that the City is therefore liable under both 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act.

The City argues that if the individual defendants are absolutely immune, there exists no constitutional injury upon which to predicate either a state or federal civil rights claim against it. The City's motion to dismiss is denied because it is based on the premise that all of the individual defendants are absolutely immune, which they are not. As explained above, only Ashe and Reardon are fully protected by absolutely immunity.

*Counts IV & V:* Abuse of Process

■ The Complaint alleges that Healy and Fitzgerald are liable for abuse of process in connection with the administrative hearing. To state such a claim, a plaintiff must allege facts showing that 1) "process" was used, 2) for an ulterior or illegitimate purpose, 3) resulting in damage. *Jones v. Brockton Public Markets, Inc.,* 369 Mass. 387, 390, 340 N.E.2d 484 (1975).

*Jones* indicates that Massachusetts cases of abuse of process have been limited to three procedures: writs of attachment, process used to institute a civil action, and process related to the bringing of criminal charges. *Id.* at 388, 340 N.E.2d 484. The defendants argue that because the *Jones* court declined to extend the definition of "process" to issuance of a preliminary injunction, a civil service hearing can not constitute "process" upon which a claim can be based.

There is no Massachusetts case-law as to whether a civil service hearing constitutes "process" for the purpose of an abuse of process claim. Cignetti directs the court to a case from Rhode Island, *Hillside Associates v. Stravato,* 642 A.2d 664 (R.I.1994) (hearing before zoning board sufficient to constitute "process"), which held that the misuse of quasi-judicial administrative proceedings for an ulterior purpose is sufficient to state an abuse of process claim.

Because the Civil Service proceeding compelled the parties to submit to the jurisdiction of the Civil Service Commission, to retain counsel, to provide testimony, and to abide by the decision of the ALJ, a reason-able argument can be made that the Civil Service hearing constitutes such "process." Nevertheless, the question remains whether Cignetti can establish that the "process" in question was used for an ulterior motive, a prosecution which can not be determined on the present record.

*Count VI:* Libel

■ Cignetti alleges that Chief Fitzgerald "falsely and maliciously published a statement to all fire department personnel by way of a General Order on July 31, 1993" regarding the CFD's disciplinary actions against Cignetti. (Complaint ¶ 60). Cignetti contends that the Order contains libelous statements which exceed any privilege Fitzgerald may have possessed to communicate matters of common interest to members of the CFD. In particular, Cignetti takes issue with that part of the General Order which states that Cignetti "left a large area without fire protection or EMS response, displayed a lack of good judgment, and total disregard for the members of his Company who were required to remain on duty long past their assigned tour." (General Order, attached to Cignetti Aff.)

Fitzgerald argues that Cignetti's claim should be dismissed because the General Order consisted of non-acceptable statements of opinion and because the statements at issue were made "within the context of an employment relationship by and to plaintiff's supervisor or co-workers [and] are conditionally privileged if [Fitzgerald] reasonably believed his statements to be true and acted in good faith."

In *Disend v. Meadowbrook School,* 33 Mass.App. 674, 604 N.E.2d 54 (1992), the Appeals Court found that a headmaster's letter to parents regarding the termination of a teacher could "reasonably be understood in a defamatory sense." In so finding, the court rejected the school's argument that the letter was no more than an expression of opinion. Contrasting the situation to cases in which the speech or writing "implied commentary rather than the statement of objective facts," it held that the headmaster's letter "was a communication in the nature of report of fact that [the teacher] was involved in an incident [ ] detrimental to the school

children." *Id.* at 676, 604 N.E.2d 54. Moreover, the court found that the "import of the letter implied the existence of other undisclosed facts [ ] which were discrediting, and potentially defamatory." *Id.*

Fitzgerald's General Order in this case can certainly be read as a statement of facts. The Order purports to describe the findings of the CFD's disciplinary proceedings against Cignetti, and not simply to articulate Fitzgerald's opinion on the July 7 and 13 incidents. Accordingly, the statements, if false and damaging, would be defamatory.

Fitzgerald argues, however, that even if the Order was defamatory, his statements are qualifiedly privileged. An employer may possess a conditional privilege "to disclose disparaging information about an employee in furtherance of the reasonable business objectives of the employer." *Disend,* 33 Mass.App. at 677, 604 N.E.2d 54; *Foley v. Polaroid,* 400 Mass. 82, 92, 508 N.E.2d 72 (1987). However, the privilege is ineffective if the statement was made recklessly or with malice. *Bratt v. Int'l Bus. Machines Corp.,* 392 Mass. 508, 512, 467 N.E.2d 126 (1984). All that can be determined at this stage of the proceedings is that, assuming the privilege extends to Fitzgerald, which is a likely since the statements were made in the context of employment, Cignetti has nevertheless stated a claim that Fitzgerald's statements were made recklessly or with malice.

\*    \*    \*

Defendants' motion to dismiss the complaint is granted as to Jeffrey Ashe and Gerald R. Reardon and as to the testimony of Gelinas, Cahill and Fitzgerald to the extent that their testimony was not part of a conspiracy including non-testimonial acts, and is otherwise denied.

It is so ordered.