**Richard ACCIAVATTI, Plaintiff,**

v.

**PROFESSIONAL SERVICES GROUP, INC. and James Muylle, Defendants.**

**No. CA. 97–10178–JLT.**

United States District Court, D. Massachusetts.

Oct. 23, 1997.

James M. Caramanica, Law Offices of John C. Carleen, Boston, MA, for Plaintiff.

Kenneth M. Bello, Matthew S. Forsyth, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Defendants.

## MEMORANDUM

TAURO, Chief Judge.

This action arises out of Plaintiff Richard Acciavatti's termination from the employ of Defendant Professional Services Group, Inc. ("PSG") by his supervisor, Defendant James Muylle. Mr. Acciavatti asserts state-law claims for wrongful termination in violation of public policy (Counts I and II), intentional interference with contractual relations (Count III), intentional and negligent infliction of emotional distress (Count IV), defamation (Count V), and violation of his civil rights under the Massachusetts Civil Rights Act ("MCRA") (Count VI). Presently before the court are the Defendants' motions to dismiss Counts I through V of Acciavatti's original complaint and Count VI of his amended complaint.

## I.

### BACKGROUND

For purposes of these motions, the facts alleged in Plaintiff's original and amended complaints are presumed true. Defendant PSG, a Minnesota corporation having a principal place of business in Massachusetts, contracts with municipalities throughout the country to operate drinking and waste water treatment facilities. Plaintiff Acciavatti worked as a plant operator for PSG under Defendant Muylle's supervision at the City of Brockton's water treatment facility from December 17, 1988 until May 10, 1995. On this latter date, PSG fired Mr. Acciavatti for purportedly failing to discover and correct a precipitous drop in the PH level of outflowing water, thereby allowing the plant to fall out of compliance with federal standards.

Acciavatti, throughout his employment at PSG, was covered by a collective bargaining agreement (the "CBA") between the company and Local 877, International Union of Operating Engineers. In relevant part, the CBA allows PSG to "discipline, suspend, demote, or discharge" regular employees for just cause. The CBA also provides that an employee challenging a disciplinary decision must submit a written grievance to the appropriate PSG project manager within ten days of the adverse decision and may, thereafter, submit the grievance to PSG's Vice President of Operations for resolution through discussion with the Union. Finally, the CBA provides that, given the parties' failure to resolve the matter, a grievant may submit a written request to arbitrate to PSG. *See* Defendants Professional Services Group, Inc.'s and James Muylle's Memorandum in Support of Their Motion to Dismiss All Claims of Plaintiff's Complaint, Exhibit A.

Acciavatti's complaint alleges that, in September of 1993, he learned that total coliform bacteria had contaminated the City's drinking water supply. Acciavatti avers that Muylle, then plant manager at the Brockton facility, also knew of the contamination. Acciavatti further avers, that both Muylle and PSG concealed the contamination for approximately three weeks and failed, during that time, to rectify the problem.

In light of PSG's and Muylle's failure to remedy the contamination, Acciavatti allegedly informed the City of Brockton's Department of Public Works Commissioner of the ongoing contamination. On October 15, 1993, City officials confronted PSG about the contamination, and, on October 16, 1993, the defendants, according to Acciavatti, began a pattern of retaliatory treatment against him because he had reported the

contamination. In particular, on January 6, 1994, Muylle placed Acciavatti on suspension without pay pending discharge. Acciavatti contested this suspension through the grievance and arbitration provisions of the CBA. An arbitrator, thereafter, ordered PSG to reinstate Acciavatti with all employment rights and benefits intact.

Acciavatti alleges that, despite his reinstatement, the defendants continued their pattern of retaliatory treatment until Muylle again placed him on suspension without pay pending discharge. He again contested his suspension, but, on August 5, 1996, the appointed arbitrator found just cause for Acciavatti's suspension and subsequent termination.

## II.

### ANALYSIS

#### A. Dismissal Standard

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is to "test the formality of the statement of the claim for relief." *International Bank of Miami v. Banco de Economias y Prestamos*, 55 F.R.D. 180, 185 (D.P.R.1972). A defendant who presents a motion to dismiss admits, for purposes of the motion, all the material allegations of the complaint but "does not admit any conclusion of law or unwarranted deductions of fact made therefrom." *Id.* In deciding such a motion, the court must, therefore, view all material allegations in the light most favorable to the plaintiff and resolve all doubts in her favor. *Dunn v. Gazzola*, 216 F.2d 709 (1st Cir.1954). The court should not dismiss a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

#### B. Federal Jurisdiction

■ Defendants' removal of this case under the "federal question" rubric and their subsequent motion to dismiss the case for lack of pleading under federal law raise the issue of whether this court can properly exercise jurisdiction over Plaintiff's claim's, all of which are facially grounded in state common and statutory law. Generally, a district court cannot exercise federal question jurisdiction unless a federal question is "presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987). Under a well-established exception to the "well pleaded complaint" rule, however, any state law claim that is subject to complete preemption under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, is considered a claim arising under federal law within the district court's jurisdiction. *Newberry v. Pac. Racing Ass'n*, 854 F.2d 1142, 1146 (9th Cir.1988).

As a result, PSG and Muylle properly sought to remove this case under 29 U.S.C. § 185, and this court can, therefore, properly hear this motion.

#### C. Counts I and II: Wrongful Termination in Violation of Public Policy

In Counts I and II, Acciavatti claims that the defendants discharged him because he performed the important and socially desirable act of whistleblowing, with adverse consequences to PSG and Muylle, and not because he failed to properly maintain PH levels at the treatment facility. Complaint ¶¶ 19–20, 24–25. PSG and Muylle argue mainly that the court should dismiss these counts because Section 301 of the LMRA preempts them.[1]

##### 1. Applying the Public Policy Exception to the At Will Employment Doctrine in the Collective Bargaining Context

■ Taking the facts alleged in Acciavatti's complaint as true, it is undisputed that a

---

1. Section 301(a) provides that:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 29 U.S.C. § 185(a).

collective bargaining agreement covered him at all times relevant to this case.[2]. Though such coverage does not compel a finding of preemption in every instance where asserted state-law claims implicate the employment relationship, preemption does occur whenever the state-law claim "depends upon the meaning of the collective bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 406, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988); *see also Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994) (noting that the preemption standard that governs cases arising under the Railway Labor Act ("RLA") [i.e., that "rights and obligations that exist independent of the collective bargaining agreement" are not preempted] mirrors that which governs those arising under the LMRA); *Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Lucas Flour Co.*, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962) (holding that Section 301 mandates resort to federal rules of law in order to ensure uniform interpretation of collective bargaining agreements and, in effect, to promote peaceable, consistent resolution of labor-management disputes).

In order to determine whether Plaintiff's cause of action for wrongful termination in violation of public policy is preempted, therefore, the court must analyze the specific nature and elements of this state-law claim. *See Allis–Chalmers v. Lueck*, 471 U.S. 202, 214, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206 (1985) (stating that "the question whether the [state-law claim] is sufficiently independent of federal contract interpretation to avoid preemption is, of course, a question of federal law"). The analysis must focus on whether the claims asserted can "stand on their own, or, instead, whether their evaluation 'is inextricably intertwined with consideration of the terms of the labor contract.'" *Cullen v. E.H. Friedrich Co., Inc.*, 910 F.Supp. 815, 821 (D.Mass.1995) (quoting *Allis–Chalmers*, 471 U.S. at 213, 105 S.Ct. at 1912).

In Massachusetts, the "cause of action for wrongful discharge in violation of public policy is a judicially created exception to the 'employment at will' doctrine." *Cullen*, 910 F.Supp. at 821; *see also Vijay N. Borase v. M/A–Com, Inc.*, 906 F.Supp. 65, 69 (D.Mass.1995); *Folmsbee v. Tech Tool Grinding & Supply, Inc.*, 417 Mass. 388, 394, 630 N.E.2d 586, 590 (1994); *Holden v. Worcester Hous. Auth.*, 1995 WL 809991, at *2 (Mass.Super. July 24, 1995). As Judge Ponsor has accordingly held, only at will employees may effectively avail themselves of this cause of action. *Cullen*, 910 F.Supp. at 821 (citing *Norris v. Lumbermen's Mut. Cas. Co.*, 881 F.2d 1144, 1152–53 (1st Cir. 1989)). The *Cullen* court reasoned that allowing employees who are party to a collective bargaining agreement to also assert causes of action for wrongful discharge in violation of public policy would "'deprive [the] employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances.'" *Cullen*, 910 F.Supp. at 821 (quoting *Azzi v. Western Electric Co.*, 19 Mass.App.Ct. 406, 410, 474 N.E.2d 1166, 1169 (Mass.App.Ct. 1985)).

Acciavatti does not assert that he was ever an at will employee of Defendant PSG. In fact, as earlier noted, he admits that a contract governed his employment with this defendant at all times. Furthermore, Section 3.01 of that contract provided that PSG could discharge its regular employees, including Mr. Acciavatti, only for "just cause." Because the CBA includes this discharge provision, and because the CBA also provides a grievance and arbitration procedure by which Acciavatti could (and did) object to PSG's actions, the public policy exception to the employment at will doctrine does not apply in the immediate cast.[3] Accordingly,

---

2. In ¶7 of Acciavatti's original complaint, he states that Defendant PSG and the union to which he belonged were "parties to a [CBA]."

3. It is important to note that the public policy exception, even if viable in Acciavatti's hands, "does not [always] extend to protect employees who perform 'appropriate, socially desirable [but not legally required] duties.'" *Cullen*, 910 F.Supp. at 821 (quoting *Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 475, 589 N.E.2d 1241, 1244, 1245 (1992)). In this instance, however, it appears that Acciavatti has, indeed, performed an important public deed—a deed that may accurately be aligned with well-

Acciavatti cannot present a viable common law claim for wrongful discharge based on an alleged violation of public policy.

### 2. *Section 301 Preemption*

■ Even if Acciavatti had been an at will employee at the time of his discharge, Section 301 nonetheless preempts his claim. Though the First Circuit has yet to rule whether Section 301 preempts a Massachusetts action for wrongful discharge in violation of public policy, it has affirmed the dismissal of a common law wrongful discharge claim that arose when an employer fired its employee because the former wished to deny the latter his earned commissions. *Quesnel v. Prudential Ins. Co.,* 66 F.3d 8 (1st Cir.1995). The court's ruling in that decision derived largely from the fact that the relevant collective bargaining agreement governed the terms of compensation and, more importantly, set forth procedures for grieving termination without just cause. In particular, the court stated that Section 301 preempted the plaintiff's claims because

> "[t]he CBA sets forth the terms and scope of the employment relationship . . . encompassing rates of pay, wages and conditions of employment. Significantly, the CBA sets forth grievance procedures for alleged wrongful termination. Determination of whether Quesnel was indeed wrongfully terminated and whether his failure to follow grievance procedures set forth in the CBA nonetheless precludes his claim would require a court, as the district court found, to immerse itself in the CBA's terms."

*Id.* at 10.

In light of the circuit courts's ruling in *Quesnel,* Judge Ponsor subsequently held that Section 301 preempts claims of wrongful discharge in violation off public policy. *Cullen,* 910 F.Supp. 815. In *Cullen,* the court's

ruling turned on the fact that "the resolution of [the defendant's claim] depend[ed] upon an interpretation of the just cause provision of the [collective bargaining agreement]." *Id.* at 822. Such is also the case here.

Acciavatti asserts, however, that the Supreme Court's decision in *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203, mandates an outcome different from *Cullen*'s. This court disagrees. In *Hawaiian Airlines,* the Court ruled that Section 301 did not preempt a claim of wrongful discharge in violation of the public policy expressed in the Federal Aviation Act and its implementing regulations. But, because the supreme court of Hawaii had already determined that a contractual employee could effectively assert a claim of wrongful discharge in violation of public policy, the Court never confronted the question of "whether the plaintiff had made the threshold showing of the viability of her state-based cause of action." *Cullen,* 910 F.Supp. at 823.

Moreover, in its directly relevant reasoning, the Court conflated the plaintiff's common law claim with the statutory claim of retaliatory discharge, stating that "[t]he state tort claim[ ] . . . require[s] only the purely factual inquiry into any retaliatory motive of the employer." *Id.* 512 U.S. at 266, 114 S.Ct. at 2250 (citing *Lingle,* 486 U.S. 399, 108 S.Ct. 1877, for the proposition that a finding of retaliatory motive and, in turn, retaliatory discharge is purely a question of fact that does not require interpretation of the relevant collective bargaining agreement). In effect, the Court failed to directly address the wrongful discharge claim, a claim whose central inquiry requires an interpretation of the collective bargaining agreement's just cause provision rather than a dissection of the employer's motives.[4] *See Cullen,* 910

---

established public policy. Both the Massachusetts Legislature and Congress clearly encourage and protect actions such as Acciavatti's. *See* M.G.L. c. 149 § 185 (Whistleblower's Statute); 42 U.S.C. § 300j–9(i) (Safe Drinking Water Act). The Massachusetts Supreme Judicial Court has also noted that "[w]histleblowing . . . may fall into this [public policy] category." *Flesner v. Technical Communications,* 410 Mass. 805, 811 n. 3, 575 N.E.2d 1107, 1111 n. 3 (1991). Ac-

cordingly, Plaintiff is correct in citing as well-established public policy the protection of the health, safety, and welfare of the users of Brockton's drinking water supply.

4. In fact, the First Circuit has found that even retaliatory discharge claims brought pursuant to Massachusetts statutory law are preempted by Section 301. *See Magerer v. John Sexton & Co.,* 912 F.2d 525 (1st Cir.1990). The court reached

F.Supp. at 822 (stating that the question of whether a union employee was discharged wrongfully or with good cause "is one that was intended to be decided under the contract"). Even in light of the *Hawaiian Airlines* decision, therefore, Acciavatti's wrongful discharge claim is preempted.

In sum, Acciavatti cannot avail himself of the public policy exception because he is not an at-will employee. Even assuming that this type of wrongful discharge claim is viable in the hands of contractual employees, Acciavatti's substantive claim is preempted by Section 301 and cannot, therefore, withstand scrutiny under Federal Rule of Civil Procedure 12(b)(6).

### D. Count III: Intentional Interference With Contractual Relations

In Count III, Acciavatti claims that Mr. Muylle intentionally and maliciously interfered with the advantageous contractual relationship between the former and PSG. Complaint ¶¶ 29–30. Muylle asserts that the court should dismiss this count as similarly preempted by Section 301.

#### Section 301 Preemption

The First Circuit squarely addressed this issue in *Magerer v. John Sexton & Co.*, 912 F.2d 525 (1st Cir.1990), where an employee asserted a claim identical to Acciavatti's against his supervisor. There, the court held that Section 301 did, in fact, preempt the employee's claim for intentional interference with contractual relations. The court reasoned that the actions allegedly constituting wrongful interference were taken by the defendant in his capacity as supervisor and, in accord, as an agent on behalf of the employer. *Id.* at 530 (citing *Kneeland v. Pepsi Cola Metropolitan Co., Inc.*, 605 F.Supp. 137, 139 (D.Mass.1985)). As such, the defendant supervisor's actions were governed by the collective bargaining agreement, and evaluation of those actions, therefore, entailed interpretation of the same. *Magerer*, 912 F.2d at 530.

The First Circuit's reasoning applies here as well. Acciavatti attempts to distinguish this case from *Magerer* by asserting that Defendant Muylle, unlike the defendant supervisor in *Magerer*, acted beyond the scope of his employment in discharging Plaintiff. But determining whether Muylle acted within the scope of his employment requires reference to, and interpretation of, the CBA, which sets forth the respective rights and obligations of both Plaintiff and Muylle. And more fundamentally, Plaintiff's intimation that Muylle discharged Plaintiff without PSG's blessing is largely self-defeating. After all, Acciavatti's pleadings situate Defendant PSG as an equal, if not the primary, wrong-doer with respect to his contested termination. Mr. Acciavatti, in effect, indicates that PSG would have fired him regardless of who his supervisor was. Consequently, Muylle can hardly be said to have interfered with otherwise stable contractual relations.

■ In addition, under Massachusetts law, a plaintiff asserting a cause of action for intentional interference with contractual relations must show that he or she "had a contract with a third party [and that] the defendant knowingly induced the third party to break that contract." *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812 551 N.E.2d 20, 21 (1990). The ultimate determination of whether PSG "broke" the contract and whether Muylle improperly induced PSG to do so turns on an initial determination of whether PSG was entitled to discharge Acciavatti under the CBA's terms. In effect, this claim requires direct interpretation of the CBA and is, therefore, preempted by Section 301. *See Beard v. Carrollton R.R.*, 893 F.2d 117, 122 (6th Cir.1989) (holding that, because breach of contract is an essential element of a state-law claim for wrongful interference with contractual relations, the claim requires interpretation of the relevant collective bargaining agreement and is preempted by the RLA).

this conclusion by noting that the Massachusetts Legislature expressly made such claims subject to the terms of any applicable collective bargaining agreement under M.G.L. c. 152, § 75B. *Id.* at 529. It, therefore, appears that, even on the

claim clearly addressed by the Supreme Court in *Hawaiian Airlines*, differences in state-law inevitably mandate different outcomes on the issue of preemption.

### E. Count IV: Intentional/Negligent Infliction of Emotional Distress

In Count IV, Acciavatti claims that the defendants intentionally or negligently inflicted severe emotional distress on him by directing behavior of an extreme and outrageous nature toward him. Complaint ¶ 33. PSG and Muylle assert that the court should dismiss this count because it is preempted by federal labor law under Section 301 and because it is barred by the exclusivity provision of the Massachusetts Workers' Compensation Act ("MWCA"), M.G.L. c. 152 § 24.

#### Workers' Compensation Act Exclusion

■ Defendants PSG and Muylle correctly contend that the exclusivity provision of the MWCA precludes Acciavatti's intentional and negligent infliction of emotional distress claims. This court need not, therefore, reach the Section 301 preemption issue. Specifically, the MWCA's exclusivity provision bars employees from suing their employer for "a[ny] personal injuries arising out of or in the course of employment." *Foley v. Polaroid Corp.*, 381 Mass. 545, 548–49, 413 N.E.2d 711, 713–14 (1980). Potentially included within the ambit of this rule are an employee's claims arising from an employer's negligence, *Liberty Mut. Ins. Co. v. Westerlind*, 374 Mass. 524, 526, 373 N.E.2d 957, 959 (1978), as well as claims arising from intentional acts. *Anazlone v. Massachusetts Bay Transp. Auth.*, 403 Mass. 119, 124, 526 N.E.2d 246, 249 (1988).

Recently, both the First Circuit and lower Massachusetts state courts have found that the preclusive effect of the MWCA extends to claims for both negligent and intentional infliction of emotional distress. *Clarke v. Kentucky Fried Chicken of California, Inc.*, 57 F.3d 21, 28–29 (1st Cir.1995) (holding that the MWCA "obviously precludes an action for intentional infliction of emotional dis-

tress" and that, in light of this fact, "it seems unlikely that the Legislature intended to preserve a civil action for claims based on negligent infliction of emotional distress"); *Asullak v. Gymnax Gymnastics Club, Inc.*, 1994 WL 879804, at *4 (Mass.Super. Mar. 11, 1994) (same) Acciavatti asserts just such claims in Count IV of his complaint. As a result, this count collapses beneath the precedential weight of state-law principles.[5]

### F. Count V: Defamation

In Count V, Acciavatti claims that Defendants PSG and Muylle intentionally or recklessly caused false and defamatory statements about him to be published to third parties, thereby injuring his reputation. Complaint ¶ 36. PSG and Muylle argue that the court should dismiss this count because Plaintiff has failed to allege facts in his complaint sufficient to state a claim upon which relief may be granted.

#### Complaint Factually Deficient

■ It is well-settled that if a complaint fails to allege an element necessary to obtain relief, dismissal is in order. *See, e.g., R.J.R. Services, Inc. v. Aetna Casualty and Sur. Co.*, 895 F.2d 279, 281 (7th Cir.1989). In his complaint, Acciavatti has failed to describe any relevant communication(s) by Defendants, whether superficially defamatory or not, as required to establish a common law claim of defamation. Because Acciavatti has failed to state factual allegations, "either direct or inferential, regarding each material element necessary to sustain recovery under [a defamation] theory," *Remco Distributors, Inc. v. Oreck Corp.*, 814 F.Supp. 171, 174 (D.Mass.), *aff'd*, 981 F.2d 1245 (1st Cir.1992), his defamation claim cannot go forward.

■ Furthermore, Mr. Acciavatti's argument that PSG's and Muylle's proper remedy lies in submitting a motion for a more definite statement is without merit. Use of such

5. The sole exception to the MWCA does not apply in this case. Under that exception, an employee may bring suit against his or her supervisor individually if that individual acted beyond the scope of his or her employment. *Miranda v. Back Bay Publishing Co.*, 1996 WL 406309, at *4 (Mass.Super. July 22, 1996). To range beyond the scope of employment, however, an act must be discharged beyond "the exercise ... of super-

visory duties and [without] furtherance of the employer's interest." *Id.* Plaintiff Acciavatti alleges insufficient facts in his pleadings to sustain a finding that Defendant Muylle acted beyond the scope of his duties and in contravention of Defendant PSG's interests. In fact, Acciavatti's complaint paints a picture of these defendants acting in collusion. Taken on its face, therefore, Claim IV is precluded by the MWCA.

a motion is proper where the pleading "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading" even though the complaint evidences all necessary elements of the claim. Fed.R.Civ.P. 12(e). Conversely, it is not proper where, as here, the complainant has altogether omitted one or some of these elements from the complaint.

## G. Count VI: Violation of the Massachusetts Civil Rights Act

 In Count VI of his amended complaint, Acciavatti claims that PSG and Muylle subjected him to retaliatory treatment and terminated him because he exercised his constitutional right to free speech by informing Brockton officials of the coloform contamination. The defendants assert that the court should dismiss this count because Acciavatti fails to allege facts that indicate the presence of physical confrontation or violence, as allegedly required under the MCRA PSG and Muylle also assert that this claim, like the claims in Acciavatti's original complaint, is preempted by Section 301 and additionally barred by the thirty-day statute of limitations for arbitration award review. Finally, they contend that this claim is precluded by the doctrine of *res judicata* because Acciavatti's discharge and facts relevant thereto were addressed and resolved in final and binding arbitration.

### 1. Physical Confrontation Under the MCRA

A violation of the MCRA consists in interfer[ing] by threats, intimidation or coercion, or attempt[ing] to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

M.G.L. c. 12, § 11H (1997). Although a plaintiff has the burden of establishing that the speech in question is protected speech, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), Acciavatti has met his burden here. He has alleged that PSG and Muylle subjected him to retaliatory treatment and fired him because he exercised his constitutional right to free speech by informing Brockton officials about the water supply contamination.[6] These allegations firmly establish· that protected speech of public concern is at issue in this case.

 Moreover, Mr. Acciavatti has satisfied his burden in demonstrating sufficient "threats, intimidation or coercion" under the MCRA. Contrary to Defendants' position, the MCRA does not always require physical confrontation. *Bally v. Northeastern Univ.*, 403 Mass. 713, 718–20, 532 N.E.2d 49, 52–53 (1989); *see also Broderick v. Roache*, 803 F.Supp. 480 (D.Mass.1992) (holding that, although actual or potential physical duress is easily identified and, accordingly, may serve as a proxy for threats, intimidation, or coercion, a scheme of harassment arising from the exercise of secured rights also violates the MCRA). Rather, cancellation of a contract securing future economic gain, when tied to the exercise of a constitutional right, can constitute coercion. *See Redgrave v. Boston Symphony Orchestra, Inc.*, 399 Mass. 93, 502 N.E.2d 1375 (1987) (finding a cause of action under the MCRA where defendant cancelled a commercial contract with plaintiff due to plaintiff's speech).[7] In this case, Ac-

---

**6.** Massachusetts law treats whistleblowing as protected speech because its subject matter is typically of public concern. *See Flesner v. Technical Communications Corp.*, 410 Mass. at 810, 575 N.E.2d at 1111 (1991) (noting that whistleblowing is a high priority public policy, even in instances where the law does not explicitly require it). Furthermore, the Massachusetts Legislature has reinforced the notion that whistleblowing is of public concern by enacting a statute that protects whistleblowers from wrongful termination by government employers. M.G.L. c. 149 § 185. Congress has also pro-

tected this type of reporting under the Safe Drinking Water Act, 42 U.S.C. § 300j–9(i).

**7.** *This case is readily distinguishable from Conway v. Boston Edison Co.*, 745 F.Supp. 773 (D.Mass.1990), in which the district court found that a negative employment decision itself does not constitute coercion under the MCRA. In that case, the relevant employment decision was a failure to rehire, rather than a discharge of, the plaintiff. Obviously, then, the plaintiff in *Conway*, unlike Mr. Acciavatti, was not already a

ciavatti's termination is just such a cancellation: taking the facts of his complaint as true, tie defendants fired Acciavatti, thereby cancelling a future economic relationship with him, because his speech negatively impacted them. The defendants' retaliatory behavior, therefore, constitutes the requisite "intimidation, threat, or coercion" under the MCRA.

In addition, it is significant that Massachusetts courts have recognized speech-based causes of action under the MCRA even in cases where no opportunity for future adverse speech exists. *See Redgrave*, 399 Mass. 93, 502 N.E.2d 1375 (finding a cause of action where the defendant cancelled a commercial contract with plaintiff due to plaintiff's past speech); *cf. Karetnikova v. Trustees of Emerson College*, 725 F.Supp. 73 (D.Mass.1989) (finding a cause of action where plaintiff was denied tenure due to past speech). Along the same lines, Massachusetts courts and this district court have recognized such causes of action where the offensive conduct consisted of retaliation for a single instance of protected speaking. *See Cignetti v. Healy*, 967 F.Supp. 10 (D.Mass. 1997) (holding that a firefighter's allegations that city officials retaliated against him for making public statements regarding the city's waste policies sufficed to support claims under the First Amendment and the MCRA); *Storlazzi v. Bakey*, 894 F.Supp. 494 (D.Mass.), *aff'd*, 68 F.3d 455 (1st Cir.1995) (holding that, where plaintiff establishes a causal link between protected speech and retaliatory action, a cause of action exists under the MCRA); *Orkiolla v. Action for Boston Community Dev.*, 1993 WL 818617 *1 (Mass.Super.Nov.12, 1993) (finding a violation of the MCRA where an employer fired the plaintiff for publicly criticizing his employer and his supervisor). Accordingly, PSG's and Muylle's alleged harassing conduct satisfies the "intimidation, threat, or coercion" requirement even though it targeted past, rather than future, speech.[8]

### 2. Section 301 Preemption

■ Furthermore, Section 301 does not preempt Acciavatti's claim under the MCRA. In *Karetnikova v. Trustees of Emerson College*, 725 F.Supp. 73, this district court found that the plaintiff's speech-based claim under the MCRA did not fall within the scope of Section 301. The court in *Karetnikova* reasoned that, "although the plaintiff's MCRA claim may refer to the [collective bargaining agreement] in some respects, it does not substantially depend upon an interpretation of the [same]." *Id.* at 79. In addition, the court noted that resolution of the MCRA claim involved "purely factual questions," none of which depended upon interpretation of the relevant collective bargaining agreement. *Id.* at 79.

As in *Karetnikova*, a decision in this case will require the court to simply determine whether the proffered reason for Acciavatti's termination is pretextual and, if so, the extent to which the true explanation includes the forbidden motive of retaliating against Acciavatti because he informed City officials of the water contamination. The court need not determine whether the proffered reason, if not pretextual, constituted a sufficient reason for discharge under the CBA. In effect, Acciavatti's MCRA claim is not intimately intertwined with the CBA and, in accord, is not preempted by Section 301.

### 3. Thirty-day Statute of Limitations

■ The thirty-day statute of limitations for contesting arbitration decisions is inapplicable in this case and cannot, therefore, extinguish Acciavatti's MCRA claim. More particularly, PSG's and Muylle's convocation of Massachusetts' thirty-day statute of limitations is either a misguided or an artful attempt to foreclose Acciavatti from asserting additional, non-arbitrated claims against them. Simply put, Acciavatti does not seek review of any past arbitration award. Because it is only in those cases where such review is sought that the thirty-day statute of limitations applies, this ground for dismissal of Count VI collapses. *See* M.G.L. c.

---

contracted employee with a tangible expectation of future economic gain.

8. Of course, one could also logically infer that Defendants sought, through their offensive conduct, to deter Plaintiff from publicizing similar information in the future.

150C, §§ 10–11(b) (allowing confirmation or vacatur of an arbitration award by the Massachusetts superior court in appropriate circumstances).

#### 4. *Res Judicata*

The defendants' reliance on the theory of *res judicata* in this context is similarly misplaced. Although *res judicata* applies with equal effect to matters litigated in court and matters determined in binding arbitration, *Bailey v. Metropolitan Property and Liab. Ins. Co.*, 24 Mass.App.Ct. 34, 505 N.E.2d 908 (Mass.App.Ct.1987), it does not apply where, as here, the rights proffered for adjudication are not properly arbitrable.

In order to prevail at the dismissal stage on a theory of *res judicata*, a defendant must show that: (1) a previous action took place between the same parties or their privies; (2) the same subject-matter was involved in both actions; and (3) the prior action was decided against the party attempting to litigate the same subject matter again. *Capizzi v. Verrier*, 1996 WL 414034, at *3 (Mass.Super. July 23, 1996) (quoting *Hopkins v. Holcombe*, 308 Mass. 54, 57, 30 N.E.2d 824, 826 (1941)). If, however, the claim asserted in the second action "could not have been asserted against the defendant in the first action," the latter claim is not extinguished. *Capizzi*, 1996 WL at *4.

In the instant case, the previous arbitration did, in fact, take place between the same parties and their privies (i.e., between Defendants and Plaintiff's union representative) and was, in fact, decided against Acciavatti. Still, despite the similar factual underpinnings of the arbitration and the present lawsuit, the subject matter of each action differs significantly. More particularly, Acciavatti is currently seeking redress for a violation of his independent state-law rights, as set forth under the MCRA, rather than vindication of his contractual rights, as set forth under the CBA.

In accord with this distinction, Article XVIII of the CBA, which sets forth the relevant grievance and arbitration procedures, refers only to "alleged violat[ions of] provisions of the Agreement." In effect, a finding that Acciavatti's MCRA claim is not preempted by Section 301 because it is not intertwined with the CBA directs an attendant finding that Acciavatti had neither the "incentive [n]or the opportunity to litigate the [MCRA] matter fully." *Capizzi*, 1996 WL 414034 at *3. Despite the fact that both the arbitration and the immediate action stemmed from a single culminating act—PSG's and Muylle's discharge of Acciavatti—the plaintiff's participation in the arbitration proceeding does not, consequently, bar him from asserting his MCRA claim in the judicial forum.

### H. *Pendant Jurisdiction*

Although federal district courts have discretion to exercise pendant jurisdiction over remaining state-law claims such as Acciavatti's MCRA claim, *see Rosado v. Wyman*, 397 U.S. 397, 404–05, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970) (holding that the common sense policy of pendant jurisdiction ensures conservation of judicial resources and avoids multiplicity of litigation), this court declines to do so in this case. All possible federal causes of action having been dismissed, concerns of neither economy nor fairness mandate that this court preside over this state-law cause of action.

### III.

### *CONCLUSION*

For the foregoing reasons, PSG's and James Muylle's Motion to Dismiss All Counts of Plaintiff's Complaint is ALLOWED, and PSG's and James Muylle's Motion to Dismiss Count VI of Plaintiff's Amended Complaint is DENIED. Count VI is hereby REMANDED to state court.