Peter V. CIGNETTI, III, Plaintiff,

v.

Robert W. HEALY, Michael P. Gardner, Kevin J. Fitzgerald, Walter J. Ellis, John J. Gelinas, Gerald R. Reardon, Jeffrey W. Ashe, Thomas F. Cahill, and City of Cambridge, Defendants.

No. CIV. A. 96–11427–MEL.

United States District Court,
D. Massachusetts.

March 21, 2000.

George C. Deptula, Boston, MA, Richard D. Clarey, Law Office of Richard D. Clarey, Boston, MA, for Peter V. Cignetti.

Joan M. Griffin, Casner & Edwards, Boston, MA, for Robert W. Healy, Michael P. Gardner, Kevin J. Fitzgerald, John J. Gelinas, Gerald R. Reardon, Jeffrey W. Ashe, Thomas F. Cahill.

Arthur J. Goldberg, City Hall, Law Dept., Cambridge, MA, for City of Cambridge.

## MEMORANDUM AND DECISION

LASKER, District Judge.

Peter Cignetti, a Captain in the Cambridge Fire Department, brings this 42 U.S.C. § 1983 action, alleging primarily that the City of Cambridge and officials of the City and of the Cambridge Fire Department engaged in a pattern of harassment and coercion in retaliation for his exercise of his First Amendment right as a public employee to speak on matters of public concern. He also asserts violations of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H and 11I, and common law claims of abuse of process and libel against certain defendants. The individual defendants now move for summary judgment as to the claims against them. The motion is granted.

### I.

The complexity of the facts alleged and the unprecedented number of legal claims made necessitates the tedious treatment that follows:

Cignetti was hired by the Cambridge Fire Department (the "CFD") in September 1980 and, since April 1991, has held the rank of Captain. He considers himself "a vocal representative of the Cambridge Firefighter's Union" and has also been active in local community affairs in Cambridge.[1]

He alleges that while performing his duties as a Union representative and en-

1. Cignetti was elected to the Union's Executive Board in 1983, served on several Union committees, chaired the Joint City/Union Fire Department Committee on Health and Safety, and represented the Union as an alternate/delegate at the International Association of Fire Fighters Convention and the State Fire Fighters Convention. He also served as the Trustee of the City's Health and Welfare Fund representing Public Safety Personnel, was the Fire Department/Union representative to the City's Employee Assistance Program and was a delegate for the Union to the Professional Fire Fighters of Massachusetts. In addition, he has served as President in the local parent-teacher organization and Treasurer for the Fitzgerald After School program. He was a member of the North Cambridge Affordable Housing Committee, the Railroad Safety Committee, and the North Cambridge Stabilization Committee.

gaging in local activities he came into conflict with the defendants, Robert Healy, the Cambridge City Manager; Michael Gardner, Personnel Director of the City; Kevin Fitzgerald, Chief of the CFD; and Walter Ellis, Assistant Chief of the CFD, over a variety of public policy matters. For example, he asserts that, in 1992, in a debate before the Cambridge City Council he publicly expressed his opposition to Healy and Gardner's proposal to have City employees pay a portion of their health insurance premiums. He further avers that Healy and Gardner opposed his efforts to extend benefits for City employees "beyond same sex partners to opposite sex partners and extended family living in the employee's household." He claims that his differences with Healy and Gardner as to the need for civil service reform were reported in the local newspaper.[2] In addition, he alleges that he differed with Fitzgerald and Ellis in connection with Fire Department related issues such as staffing levels, conditions of fire stations and apparatus, collective bargaining, the need for protocol in training concerning hose repair, the filing of injury reports, and district boundaries.

*Disciplinary Charges*

In July 1993, two incidents led to the disciplinary charges against Cignetti, which are at the center of this suit. First, on July 7, 1993, Cignetti took an engine company and a ladder company out of service under circumstances in which he and his subordinate, Lieutenant Jeffrey Ashe,[3] quarreled as to who was assigned to which company. The companies were returned to service within eleven minutes.

Second, on July 13, 1993, Cignetti failed to report to the Harvard Science Center to relieve the previous shift, which was responding to a bomb threat. Cignetti maintains that he had advised Fire Alarm that his company was in the station and available to serve as relief, but due to a miscommunication never received an order to relieve from Deputy Gerald Reardon,[4] the incident commander.

On July 12, Deputy Chief John Gelinas, the deputy in charge of the Division on the evening of July 7, submitted charges against Cignetti to Chief Fitzgerald in connection with the Cignetti–Ashe dispute. That report alleged that Cignetti had to be ordered twice to put the companies back in service before he complied. It differed from a July 7 report prepared by Gelinas which merely recommended that "both officers be sent to a remedial officer's training class."

Fitzgerald formally preferred charges against Cignetti concerning the July 7 incident in a letter dated July 16, 1993, alleging, *inter alia,* conduct unbecoming, neglect of, evading or shirking duty, and failing to note journal entries upon coming on duty. No formal charges were asserted against Ashe. Separate disciplinary charges relating to the July 13 incident were later preferred by Fitzgerald against Cignetti.

Fitzgerald held a hearing on the charges on July 26, 1993, at which Cignetti was represented by union counsel, Attorney Neil Rossman. Cignetti denied any wrongdoing, but on the advice of counsel agreed to accept a three day suspension to

---

**2.** The defendants' motion to strike the newspaper articles on the grounds that they contain inadmissible hearsay is denied. While the articles cannot be used to establish the truth of what they contain, they nevertheless are evidence that their difference of opinion on the issue of civil service reform was reported in the newspaper.

**3.** Lieutenant Jeffrey Ashe was originally named as a defendant in this suit. The case against him, however, was dismissed on the

grounds that he enjoyed absolute immunity because the claims against him were based solely on his testimony at the Civil Service hearing. *Cignetti v. Healy,* 967 F.Supp. 10, 19 (D.Mass.1997).

**4.** Deputy Gerald Reardon was also initially named as a defendant in this suit. The claims against him were also dismissed on absolute immunity grounds. *Cignetti,* 967 F.Supp. at 19.

settle the charges for the July 7 incident and a letter of reprimand to be expunged after one year to settle the charges stemming from the July 13 incident.

On July 30, 1993, Fitzgerald issued a General Order informing Fire Department personnel of the disciplinary action against Cignetti. The General Order stated that on July 7 Cignetti had without just cause left a large area without fire protection or EMS coverage, and that on July 13, he had shown a lack of good judgment, a complete lack of leadership, and total disregard for the members of his company by failing to relieve them. In addition, it instructed company commanders to read the order to every member of their company at roll call.

*The Appeal*

Considering the publication of the General Order a violation of the settlement, on August 2, 1993, Cignetti appealed the three-day suspension to City Manager Robert Healy, who referred the matter to City Personnel Director Gardner. On August 3, 1993, Fitzgerald appointed Deputy Chief Francis Murphy to investigate the July 7 Cignetti–Ashe dispute. In his August 5 report, Murphy recommended that Ashe be reprimanded because he "used poor judgment by failing to record the duty assignments," but suggested no discipline for Cignetti.

After Cignetti appealed the suspension, Fitzgerald forwarded a number of documents and reports concerning both the July 7 and July 13 incidents to City Manager Healy, including the two reports written by Gelinas. However, Cignetti's written accounts of the events were not included in the package. Nor did the package contain Murphy's report, the report filed by Ashe, or the subsequent reports obtained from Lieutenants Robert Scott and James Harkins, who witnessed the July 7 incident.

Sometime after the July 7 incident, Chief Fitzgerald directed Thomas Cahill of Fire Alarm to make a cassette tape recording of relevant radio and telephone communications between Engine 3 and Fire Alarm from that evening. Cahill testified that, based on Fitzgerald's instructions, he searched through the various tracks of the master tape for the requested conversations and recorded them on a cassette tape. Similarly, after the July 13 incident, Fitzgerald asked Cahill to record relevant communications from that evening as well and Cahill added the second set of communications to the tape.

In the meantime, by letter dated August 4, 1993, Gardner notified Cignetti, that it was the City's position that by appealing the suspension, Cignetti was in fact renouncing the settlement agreement. As a result, the letter explained that

the City [would] proceed to a full hearing, where the issues [would] be not only whether there [was] just cause for the initial suspension imposed by the Chief, but also whether there [was] just cause for any further discipline up to and including further suspension, demotion or discharge.

By letter dated August 31, 1993, Healy formally notified Cignetti of the pending disciplinary charges and that the City "[wa]s contemplating ... suspension without pay for up to six months and/or demotion in rank." The letter scheduled a hearing for September 13, 1993, but gave Cignetti the option of submitting the matter directly to the Civil Service Commission.

*Civil Service Commission Hearing*

Cignetti accepted the City's offer of submitting the matter to the Civil Service Commission. A hearing was conducted before Administrative Law Judge Jaye Whittier over the course of five days. Cignetti was represented by Attorney Harold Lichten Attorney Philip Collins represented the City of Cambridge. Ashe, Gelinas, Reardon, Cahill, and Fitzgerald testified at the hearing. Cignetti alleges that each of these five witnesses "willfully misrepresented, in [their] sworn testimony, the events

of July 7 and July 13" and that Fitzgerald "knew or should have known that the sworn testimony of Ashe, Gelinas, Reardon, and Cahill willfully misrepresented events which occurred on July 7 and July 13." Healy, Gardner and Ellis did not testify, but, Cignetti maintains, "knew or should have known that sworn testimony was given by City witnesses which willfully and maliciously misrepresented the events which occurred on July 7 . . . and July 13."

At the hearing, the City introduced the composite tape recording which had been prepared by Cahill at Fitzgerald's request. Cignetti alleges that all of the defendants "knew or should have known that the 'composite' tape . . . was willfully and maliciously altered and edited to misrepresent" the events of July 7 and July 13.

Judge Whittier ultimately found "no just cause" to discipline Cignetti and her recommendation was adopted by the Commission.

*Limited Duty/Sick Leave*

During the pendency of the disciplinary proceeding, on October 14, 1994, Cignetti underwent surgery for hand injuries. He was pronounced fit for limited duty on April 24, 1995, and served until September 8, 1995 when he was placed on involuntary sick leave. Despite written assurances from doctors that Cignetti was fit for limited duty, he alleges that Healy, Gardner Fitzgerald, and Ellis prevented him from returning to work until after the matter was put in arbitration on August 22, 1996. Cignetti was officially permitted to return to work on September 15, 1996 when he was assigned as the Deputy Director of the City Emergency Management Department.

*Procedural History*

Cignetti filed the present suit on July 15, 1996 against Healy, Gardner, Fitzgerald, Ellis, Gelinas, Reardon, Ashe and Cahill and the City of Cambridge. The City of Cambridge and the eight individual de-

fendants earlier moved for dismissal of the claims against them pursuant to Fed. R.Civ.P. 12(b)(6) on several grounds, including absolute immunity and the sufficiency of the Complaint. By decision dated May 22, 1998, that motion was granted in part and denied in part. *See Cignetti v. Healy*, 967 F.Supp. 10 (D.Mass.1997).

The decision held that Ashe, Gelinas, Reardon, Cahill, and Fitzgerald were entitled to absolute immunity from liability for the testimony they gave at the Civil Service Commission hearing even if they knowingly and intentionally perjured themselves. *Cignetti*, 967 F.Supp. at 14. However, these defendants' immunity as witnesses was held not to shield them from liability as to Cignetti's claim that their testimony was part of a conspiracy consisting of their testimony and other non-testimonial acts. *Id.*, at 14–15 (citing *Malachowski v. City of Keene*, 787 F.2d 704, 712 (1st Cir.1986)). The claims against Reardon and Ashe were dismissed because those claims were based solely on their testimony at the Civil Service hearing. *Id.*, at 19.

In connection with Healy, Gardner, Fitzgerald, Ellis, and Gelinas's argument that they were entitled to absolute immunity under the doctrine of prosecutorial immunity, it was determined that the facts of record were insufficient to determine whether they were functioning at the time in their prosecutorial capacities or merely engaging in administrative and investigative functions. *Id.* Finally, the defendants' contention that the allegations in the Complaint were insufficient was rejected. *Id.*, at 16–19.

Cignetti has since amended his Complaint. He further alleges that the defendants have continued to violate his civil rights in connection with his work assignments, the scheduling of his vacation, and the granting of promotions to the position of deputy chief.[5]

---

5. Cignetti filed a separate employment discrimination suit against the City of Cam-

bridge and Healy, Gardner, Fitzgerald and Ellis alleging that the defendants were dis-

After the completion of extensive discovery, the remaining individual defendants now seek summary judgment as to the claims against them on the grounds that (1) they enjoy absolute immunity for their actions as witnesses or prosecutors in the civil service hearing, and (2) the plaintiff has failed to present evidence of the essential elements of the claims asserted against them. The motion is granted.

## II.

*Absolute Immunity*

The individual defendants contend that as prosecutors and witnesses they are entitled to absolute immunity from § 1983 liability for all of their conduct in connection with the Civil Service Commission hearing. They argue that since this Court's decision on the motion to dismiss the plaintiff, attempting to avoid the defense of absolute immunity, has shifted the focus of his case to the composite tape recording. They maintain, however, that they are absolutely immune even as to the composite tape recording because in making the recording and offering it in evidence they were acting in their prosecutorial capacities. They argue further that they have absolute immunity as to the testimony they gave at the hearing and insist that this immunity is not defeated as there is no evidence of a conspiracy by them against Cignetti.

Cignetti answers that the defendants are not entitled to absolute immunity for the composite tape because they conspired to manufacture the tape evidence and knowingly introduced the fabricated evidence at the hearing. He argues that the defendants do not have absolute immunity for the wide variety of other administrative and investigative activities they performed in connection with the disciplinary proceeding. Moreover, he contends that the defendants who testified at the hearing forfeited their absolute testimonial immunity because sufficient evidence exists for a

reasonable jury to conclude that their testimony was part of a conspiracy. Finally, relying on *White v. Frank*, 855 F.2d 956 (2d Cir.1988) and *Krohn v. United States*, 742 F.2d 24 (1st Cir.1984), Cignetti claims that Gelinas, Fitzgerald and the other defendants do not have absolute immunity for their testimony because they are "complaining witnesses" who knowingly initiated a baseless prosecution.

■■■ Prosecutors and witnesses both enjoy absolute immunity at common law. The enactment of § 1983 did not abrogate these common law immunities. *See Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (ruling that witnesses, including police officer-witnesses, are entitled to absolute immunity from § 1983 liability); *Imbler v. Pachtman*, 424 U.S. 409, 427, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (holding that the considerations underlying absolute prosecutorial immunity at common law "dictate the same absolute immunity under § 1983"). Absolute immunity even applies to those who prosecute and appear as witnesses in the course of an adjudication before an administrative agency. *Cf. Butz v. Economou*, 438 U.S. 478, 515–17, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (concluding that agency officials performing functions analogous to those of a prosecutor are entitled to absolute immunity with respect to such acts).

### 1. *Absolute Prosecutorial Immunity*

■■■ Courts have applied a "functional approach" in determining whether or not a prosecutor enjoys absolute immunity from § 1983 liability. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). The availability of absolute immunity depends upon the nature of the function being performed rather than the identity of the actor who performed it. *Buckley*, 509 U.S. at 269, 113 S.Ct. 2606 (quoting *Forrester v. White*, 484 U.S. 219, 229, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)). Thus, absolute immunity pro-

criminating against him by not considering him for promotion to Deputy Chief. *Cignetti*

*v. City of Cambridge*, No. 99–10821 (D. Mass. filed April 15, 1999).

tects those acts which are closely associated with the judicial process and which are performed in the course of the prosecutor's role as an advocate for the State. *Imbler*, 424 U.S. at 430, 96 S.Ct. 984. However, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley*, 509 U.S. at 273, 113 S.Ct. 2606. A defendant pleading absolute immunity bears the burden of showing that it is justified by the function in question.[6] *Burns v. Reed*, 500 U.S. 478, 487, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991).

■ The defendants' argument that they are entitled to absolute prosecutorial immunity prevails only in part. They are correct that they have absolute immunity for offering the tape recording into evidence at the hearing because in doing so they were functioning as advocates. *See Imbler*, 424 U.S. at 431, 96 S.Ct. 984 (holding that prosecutors enjoy absolute immunity from § 1983 suits for initiating a prosecution and presenting the case at trial); *see also Butz*, 438 U.S. at 516–517, 98 S.Ct. 2894 ("We can see no substantial difference between the function of the agency attorney in presenting evidence in an agency hearing and the function of the prosecutor who brings evidence before a court.").

Moreover, the absolute immunity the defendants enjoy for offering the composite tape into evidence is not defeated by Cignetti's allegations that they did so maliciously or in bad-faith because they knew or should have known that the composite tape was fabricated. *See e.g. Imbler*, 424 U.S. at 409, 96 S.Ct. 984 (concluding that absolute prosecutorial immunity precluded a § 1983 claim alleging that a prosecutor

had knowingly used perjured testimony and deliberately suppressed exculpatory material at trial); *Burns*, 500 U.S. at 478, 111 S.Ct. 1934 (holding prosecutor had absolute immunity for claim for eliciting misleading testimony in a probable cause hearing); *see also Kulwicki v. Dawson*, 969 F.2d 1454, 1464 (3d Cir.1992) ("Consideration of personal motives is directly at odds with the Supreme Court's simple functional analysis of prosecutorial immunity."); *Grant v. Hollenbach*, 870 F.2d 1135, 1138 (6th Cir.1989) (holding prosecutor absolutely immune for deciding to pursue criminal charges despite challenge to his motivation); *Krohn v. United States*, 742 F.2d 24, 30 (1st Cir.1984) ("A limitation that absolute immunity from common lawsuit can only be invoked if the official acted lawfully would swallow the immunity altogether.").

■ The defendants, however, do not have absolute immunity for the claim that they fabricated the composite tape evidence. Cignetti alleges that the defendants in making the tape recording deliberately excluded certain calls and reordered the sequence of other calls in order to create inculpatory evidence of wrongdoing. The defendants maintain that they have absolute immunity because they were functioning, not in their investigative capacities, but as "advocates" in making the tape. That the preparation of the tape involved their role as "advocates," according to the defendants, is evidenced by the fact that the tape was not prepared during the "purely investigative phase" of the disciplinary proceeding. As support, they point out that the charges were preferred almost immediately after the July 7 and July 13 incidents (i.e., before the tape was made) and that neither Fitzgerald nor Gelinas relied on the tape in deciding whether to prefer charges.

6. Prosecutors enjoy only qualified immunity from § 1983 liability as to their non-prosecutorial activities. Qualified immunity operates to shield government officials exercising discretionary powers from § 1983 liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The defendants' argument, however, misconstrues the Supreme Court's decision in *Buckley v. Fitzsimmons.* In *Buckley,* the Court declined to extend absolute prosecutorial immunity to a claim that the prosecutors conspired to manufacture evidence when they were endeavoring to determine whether the bootprint at the scene of the crime had been made by the petitioner. *Buckley,* 509 U.S. at 275, 113 S.Ct. 2606. The Court explained that at the time the alleged fabrication of evidence took place the prosecutors did not have probable cause to have anyone arrested, *id.,* at 274, 113 S.Ct. 2606, and that a special grand jury was not empaneled until well after the challenged activity occurred, *id.,* at 275, 113 S.Ct. 2606. Given these circumstances, the Court concluded that at the time in question the prosecutors' mission was "entirely investigative in character," *id.,* at 274, 113 S.Ct. 2606, and therefore they "could not properly claim to be acting as advocates," *id.,* at 275, 113 S.Ct. 2606.

In this case, as in *Buckley,* the defendants have failed to establish that in making the tape recording they were functioning as "advocates." The decision to make the tape recording and the act of recording the conversations from the master tapes amount to evidence gathering activities and therefore are investigative in character.[7] *See Buckley* 509 U.S. at 273, 113 S.Ct. 2606 (distinguishing "between the advocate's role in evaluating evidence . . . and the detective's role in searching for the clues and corroboration"). *But see Mastroianni v. Bowers,* 173 F.3d 1363 (11th Cir.1999) (concluding that prosecutors were not involved in the case at the investigative stage to the extent that removal of absolute prosecutorial immunity was warranted). Moreover, it would be

incongruous to give absolute immunity to prosecutors but only qualified immunity to police officers for engaging in the same activity. *See Buckley,* 509 U.S. at 273, 113 S.Ct. 2606 (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir., 1973)) ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'"); *cf. Burns,* 500 U.S. at 495, 111 S.Ct. 1934 ("[I]t is incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice.").

Furthermore, even assuming (as the defendants suggest) that the disciplinary charges against Cignetti had already been asserted at the time the tape was made, it does not follow that the defendants in preparing the tape were performing "prosecutorial" functions. "[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606. As the Court recognized in *Buckley* (in the context of a criminal prosecution) that while the absence of probable cause indicated that the prosecutors "could not properly claim to be acting as advocates," *id.,* at 275, 113 S.Ct. 2606, "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards," *id.,* at 274, 113 S.Ct. 2606 n. 5. Likewise, the preferring of charges against Cignetti does not immunize the defendants' subsequent "investigative" activities from § 1983 liability.

Nor does the later introduction of the tape in evidence at the hearing transform

---

7. Cignetti contends that the investigative nature of the composite tape is demonstrated by a July 11, 1994 letter written by Attorney Collins, who represented the City at the Civil Service Commission hearing, to Attorney Lichten, Cignetti's counsel at the hearing. In that letter, Attorney Collins states that the tape was "made as part of the investigation."

The defendants' have moved to strike the letter. The motion is denied as moot. Although the letter itself has little or no evidentiary value, the defendants, as discussed above, have not established that they were engaging in prosecutorial functions when they prepared the tape.

the preparation of the tape into a prosecutorial activity. *See Guzman–Rivera v. Rivera–Cruz,* 55 F.3d 26, 29 (1st Cir.1995) ("The prosecutorial nature of an act does not spread backwards like an inkblot, immunizing everything it touches."); *see also Buckley,* 509 U.S. at 275–76, 113 S.Ct. 2606 ("That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from administrative into the prosecutorial.").

However, the analysis of absolute prosecutorial immunity in the present case does not end here. Cignetti's lengthy opposition alleges at least six other specific acts by the remaining defendants in connection with the disciplinary proceeding which he claims caused him constitutional injury: (1) the intentional submission of unfounded disciplinary charges to Chief Fitzgerald by Deputy Gelinas; (2) the preferring of formal charges against Cignetti by Fitzgerald who knew or should have known that the charges were baseless; (3) the issuance of the allegedly defamatory General Order by Fitzgerald; (4) the deliberate exclusion of exculpatory evidence by Fitzgerald in the material forwarded to Healy and Gardner after Cignetti repudiated the settlement agreement; (5) the pursuit of the baseless disciplinary charges and the enhancement of the potential penalty by Healy and Gardner who knew or should have known that the charges were baseless; and (6) the intentional suppression of exculpatory material by Gardner. In addition, Cignetti alleges that all of the defendants participated in a conspiracy to deprive him of his constitutional rights and engaged in a cover-up of their improper activities.

■ The first, third, and fourth acts are not protected by absolute immunity. As to the first act, the submission of charges by Deputy Gelinas to Chief Fitzgerald does not qualify as a prosecutorial function, but amounts to something more analogous to a police officer providing a prosecutor with evidence the officer has obtained during the course of his or her investigation.

■ With regard to the third act, the issuance of the alleged defamatory General Order, it is well settled that prosecutors do not enjoy absolute immunity as to conduct that is merely administrative or investigative. *See Buckley,* 509 U.S. at 273, 113 S.Ct. 2606. For example, in *Buckley,* the Supreme Court declined to extend absolute prosecutorial immunity to out-of-court statements to the press because it found that making statements to the press did not involve the prosecutor's role as an "advocate." 509 U.S. at 276–78, 113 S.Ct. 2606. In the present case, the General Order is akin to the out-of-court statements in *Buckley.* In issuing the order, Fitzgerald was merely performing an administrative task in connection with his position as Chief of the CFD.

■ Nor is Fitzgerald entitled to absolute immunity as to the fourth act; that is, the claim that Fitzgerald deliberately excluded exculpatory material from the materials he forwarded to Healy and Gardner after Cignetti's repudiation of the settlement. Once Cignetti had rejected the settlement and the matter had been referred to Healy and Gardner, Fitzgerald was no longer functioning as a prosecutor. *Cf. Kulwicki,* 969 F.2d at 1467 (affirming denial of absolute immunity because the prosecutor was no longer assigned to the case when the challenged activity occurred). Moreover, the forwarding of materials constitutes an "administrative" function which is somewhat analogous to an investigative officer supplying a prosecutor with evidence discovered during the course of an investigation.

■ However, Cignetti's claims based on the second, fifth and sixth acts are barred by absolute immunity. With respect to the second and the fifth acts, it has long been settled that prosecutors are entitled to absolute immunity for initiating and pursuing a prosecution. *See Imbler,* 424 U.S. at 431, 96 S.Ct. 984 (holding that state prosecutors enjoy absolute immunity for the initiation and pursuit of a criminal

prosecution); *Butz,* 438 U.S. at 515, 98 S.Ct. 2894 ("The decision to initiate administrative proceedings against an individual . . . is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution."). Accordingly, Fitzgerald is absolutely immune for his decision to prefer disciplinary charges, and Healy and Gardner have immunity for their decision to pursue the charges against Cignetti after he repudiated the settlement.

As to Cignetti's allegation that the defendants suppressed exculpatory material, the sixth act, it has consistently been held that absolute immunity shields a prosecutor from liability as to claims that they knowingly suppressed exculpatory evidence. *See Reid v. New Hampshire,* 56 F.3d 332, 336–37 (1st Cir.1995) (citations omitted) (applying absolute immunity rule to claim that prosecutors withheld exculpatory evidence in direct violation of trial court orders); *see also Imbler,* 424 U.S. at 425–26, 96 S.Ct. 984 (recognizing that the decisions concerning the materiality of evidence not revealed to the defense could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials).

Furthermore, Cignetti's attempt to defeat the defense of absolute prosecutorial immunity by fashioning his claim in terms of a conspiracy is not effective. *See Pinaud v. County of Suffolk,* 52 F.3d 1139, 1148 (2d Cir.1995) (quoting *Hill v. City of New York,* 45 F.3d 653, 659 n. 2 (2d Cir. 1995)) ("[W]hen the underlying activity at issue is covered by absolute immunity, the 'plaintiff derives no benefit from alleging a conspiracy.' "); *Dory v. Ryan,* 25 F.3d 81, 83–84 (2d Cir.1994) (holding that prosecutors are absolutely immune from claims alleging conspiracy to present false testimony, but witnesses, including police officer-witnesses, are not absolutely immune from such claims). Moreover, as discussed more extensively below, Cignetti's conspiracy allegations nevertheless fail because

the record is devoid of either direct or circumstantial evidence of an agreement.

Finally, Cignetti's reliance on *Gonsalves v. City of New Bedford,* 939 F.Supp. 921 (D.Mass.1996), for the proposition that prosecutors who engage in a cover-up of their own improper conduct or the improper conduct of others are not entitled to absolute immunity is misplaced. *Gonsalves* deals only with claims against police officers and has absolutely nothing to do with the immunity of prosecutors. 939 F.Supp. at 925 (holding that a § 1983 cause of action lies where police officers as opposed to prosecutors engaged in an intentional cover-up thereby depriving a person of the right to recover for constitutional violations). Moreover, in *Reid v. New Hampshire,* 56 F.3d 332 (1st Cir.1995), the First Circuit rejected a similar claim. There, the plaintiff had argued that the prosecutors had forfeited their absolute immunity by repeatedly misleading the trial court in order to conceal their alleged misconduct. *Reid,* 56 F.3d at 337. However, the court held that the prosecutors' absolute immunity was not defeated because their challenged conduct involved their role as "advocates." *Id.,* at 337 n. 11.

### 2. *Absolute Testimonial Immunity*

Witnesses are absolutely immune for the testimony they provide in the course of a judicial proceeding or an adjudication before an administrative agency. *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). However, witnesses may be sued under § 1983 for their testimony if the testimony they gave was part of a conspiracy consisting of their testimony and other non-testimonial acts. *Malachowski,* 787 F.2d at 712; *see also Dory,* 25 F.3d at 83 (holding that while witnesses enjoy absolute immunity for their actions in testifying they are not immune for extra-judicial actions such as an alleged conspiracy to present false testimony). *But see Hunt v. Bennett,* 17 F.3d 1263, 1267 (10th Cir.1994) (applying absolute immunity not only to allegations of

perjury but to claims alleging a conspiracy to present perjured testimony).

Cignetti alleges that the defendants conspired to testify falsely at the hearing and that Healy and Gardner knew or should have known that the testimony was false. According to Cignetti, the existence of a conspiracy to give false testimony can be inferred because "[i]t cannot be accidental that Fitzgerald, Ashe, Gelinas, Reardon and Cahill all testified falsely or new false testimony was given at the Civil Service Commission." Moreover, Cignetti argues that the conspiracy to testify falsely was part of a broader conspiracy to "prevent[ ] his advancement and continu[ed] employment in the Cambridge Fire Department," which included "trumping up charges against him, manufacturing evidence against him, locking him out of his job, questioning the City's own doctor about his ability to work, harassing him on the job, [and] scheming to deny him a promotion."

As discussed in more detail below, Cignetti's assertions of conspiracy are based on nothing more than "conclusory allegations, improbable inferences, and unsupported speculation." *See Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990) (explaining that the party opposing summary judgment cannot rely simply on "conclusory allegations, improbable inferences, and unsupported speculation" to defeat a properly documented summary judgment motion). Indeed, a review of the record demonstrates that there is no evidence either circumstantial or direct, that the defendants agreed expressly or impliedly to give false testimony or that the testimony at the hearing was part of a broader conspiracy.

Nor can Cignetti trump the defense of absolute testimonial immunity on the grounds that Gelinas, Fitzgerald and the other defendants are "complaining witnesses" who preferred disciplinary charges against Cignetti when they knew or should have known that such charges were baseless. As an initial matter, *Krohn v. United States* is inapposite. The opinion is devoid of any reference to complaining witnesses. In *Krohn,* the court merely declined to extend *Briscoe* immunity to a claim that an FBI agent intentionally made false statements in an affidavit to obtain an arrest warrant given the relative lack of procedural safeguards in the warrant affidavit process as compared to judge-supervised trials. 742 F.2d at 31.

Nor is *White v. Frank* applicable here. In *White,* the Second Circuit carved out a narrow exception to *Briscoe* immunity for "complaining witnesses." [8] Relying on lan-

---

**8.** Several other Courts of Appeals have adopted similar exceptions to the broad immunity recognized in *Briscoe v. LaHue. See Harris v. Roderick,* 126 F.3d 1189 (9th Cir. 1997), *cert. denied,* 522 U.S. 1115, 118 S.Ct. 1051, 140 L.Ed.2d 114 (1998) (concluding that police officers who testified before a grand and petit jury were not absolutely immune for their testimony if they functioned as complaining witnesses and the allegedly false testimony was necessary to show "the full range of occasions on which [the defendants'] falsehoods were uttered"); *Ireland v. Tunis,* 113 F.3d 1435, 1447 (6th Cir.1997) (denying *Briscoe* immunity for a "complaining witness who set the wheels of government in motion by instigating a legal action"); *Curtis v. Bembenek,* 48 F.3d 281 (7th Cir.1995) (recognizing that a § 1983 claim for malicious prosecution may be brought against a police officer based on testimony given in adversarial pre-trail proceedings); *Enlow v. Tishomingo County,* 962 F.2d 501 (5th Cir.1992) (holding that disputed issues of fact as to whether officer, who allegedly gave false testimony before a grand jury, could be considered a complaining witness prevented summary judgment); *Anthony v. Baker,* 955 F.2d 1395 (10th Cir. 1992) (holding that absolute immunity does not extend to a complaining witness who initiated a baseless prosecution by giving false testimony at either a grand jury proceeding or preliminary hearing); *see also Palma v. Atlantic County,* 53 F.Supp.2d 743 (adopting complaining witness exception as to testimony before a grand jury but not to testimony in adversarial preliminary hearings). *But see Jones v. Cannon,* 174 F.3d 1271, 1287 n. 10 (declining to adopt complaining witness exception); *Kulwicki v. Dawson,* 969 F.2d 1454, 1467 n. 16 (3d Cir.1992) ("We decline to interpret the language in *Malley [v. Briggs]* as overriding the broad witness protection announced in *Briscoe*").

guage in *Malley v. Briggs* in which the Supreme Court noted that "complaining witnesses were not absolutely immune at common law," 475 U.S. 335, 340, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), it concluded that, in the context of a § 1983 claim for malicious prosecution, "the fact that [the officer's] testimony may have been the means by which he initiated the prosecution d[id] not permit him to transpose immunity available for defamation as a defense to malicious prosecution." *White*, 855 F.2d at 961. Accordingly, the court held that if the officer could be considered a "complaining witness" he could be held "liable to the victim under section 1983." *Id.*

■■■ While the First Circuit has not had occasion to address this question, the facts in this case do not warrant application of the complaining witness exception. Criminal charges were never pursued or asserted against Cignetti. Nor does he allege a claim for malicious prosecution. *See Curtis v. Bembenek*, 48 F.3d 281, 286 (7th Cir.1995) (declining to apply "complaining witness" exception because complaint did not state a claim for malicious prosecution). Moreover, the courts adopting the exception have done so only in the context of grand jury testimony or testimony provided in other pretrial proceedings. It has not been applied to testimony given at trial. Cignetti's allegations of perjury, however, concern the defendants' testimony at the Civil Service Commission hearing, which was an adjudicatory proceeding in which both sides were represented by counsel, and therefore can be considered comparable to a trial on the merits. Accordingly, even if the First Circuit were to recognize the exception, it would not apply to this case.

### III.

*Sufficiency of the Evidence*

The defendants contend next that even if they do not enjoy absolute immunity, they are nevertheless entitled to summary judgment because after extensive discovery and numerous depositions Cignetti has failed to present evidence sufficient to support a finding of each of the necessary elements of the claims against them.

#### 1. *42 U.S.C. § 1983*

The defendants challenge Cignetti's § 1983 claims on a number of grounds. They contend that Cignetti has produced no evidence that would permit a jury to find that they committed any wrongful acts in violation of Cignetti's civil rights. They posit that all that is left of Cignetti's suit after absolute immunity is the claim that they falsified the composite tape evidence. They submit, however, that there is no evidence in the record that the tape was intentionally altered to Cignetti's disadvantage and take the position that to the extent that the tape is found to be inaccurate it was neither deliberate nor intentional. Moreover, they argue that Cignetti's First Amendment claim fails because his expression was not protected by the First Amendment as his public statements addressed solely internal fire department matters, not issues of public concern. Finally, they assert that even if Cignetti's activities were protected by the First Amendment, he has failed to connect any alleged wrongful acts with persons who might have had even a hypothetical motive to retaliate against him for his alleged First Amendment protected speech.

Cignetti counters that the evidence strongly suggests that each of the defendants engaged in numerous acts in furtherance of a conspiracy to harass and punish him in violation of his civil rights. He posits that the discrepancies between deposition testimony and the composite tape recording coupled with the indicia of alteration found by the expert examinations suggest that the defendants falsified evidence. Moreover, he claims that "it is not logical to infer that these major alterations are accidental." Furthermore, he contends that "it is reasonable to infer that the defendants, who have suggested no

other legitimate motivation for their actions, were motivated to retaliate against the plaintiff for his exercise of First Amendment rights."

■ As an initial matter, the defendants' assertion that Cignetti's alleged speech is not protected by the First Amendment is without merit. This issue was resolved by the decision on the motion to dismiss where this Court ruled that at least some of Cignetti's public statements touched on matters of public concern, such as the development of the W.R. Grace site and the extension of health care benefits, as those statements criticized City policy on issues affecting public safety. *Cignetti,* 967 F.Supp. at 16 (citing *Broderick v. Roache,* 751 F.Supp. 290 (D.Mass.1990)). That some of Cignetti's expression, particularly that concerning staffing levels and fire hose repair, could be considered to involve only internal fire department issues, *see Tang v. Rhode Island,* 163 F.3d 7 (1st Cir.1998), does not remove Cignetti's entire claim from the ambit of the First Amendment's protections.

This conclusion notwithstanding, Cignetti's § 1983 claims fail for lack of proof. At best, the record taken as a whole may indicate a fact question as to whether or not the tape amounts to an accurate reproduction. The chronology of the calls as recorded on the tape appears to differ from the sequence of the events contained in accounts provided by Cignetti and several of the defendants. These discrepancies suggest that some of the calls on the composite tape are not in the correct sequence and that other calls are missing. In addition, Ernest Aschkenasy's expert examination of the composite tape identified "audio chirps" and other indicia of alteration. Steve Cain's expert analysis also questioned the accuracy of the tape.[9]

■ However, even if the composite tape recording cannot be considered accurate, no jury could reasonably conclude that it was deliberately falsified. The First Circuit has stated that "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz,* 896 F.2d at 8. Cignetti's allegations that the tape was intentionally altered to support the Fire Department's and the City's disciplinary case are just that.

Cahill is the only defendant who had anything at all to do with the actual preparation of the tape. The record contains no evidence that Cahill intentionally added, omitted, or reorganized the conversations to Cignetti's disadvantage. Cahill testified that Chief Fitzgerald asked him to make a tape recording of relevant radio and telephone conversations between Engine 3 and Fire Alarm from the master tapes from the evening of July 7. He stated that he searched through the various tracks of the multi-track tapes for the requested conversations and, as Fitzgerald directed, recorded them on a cassette tape. Deputy Reardon testified that Cahill gave the recording to him and he played the tape for Fitzgerald.

Similarly, after the July 13 incident, Fitzgerald asked Cahill to record pertinent conversations from that evening as well. According to Reardon's deposition testimony, Reardon returned the cassette with the July 7 conversations to Cahill, who then added the second set of conversations to the tape. Reardon played the tape again for Chief Fitzgerald and kept the cassette with other tapes in his desk drawer. In

---

9. The defendants moved to strike the Steve Cain report on the grounds that the plaintiff had not properly identified Cain as an expert witness. The motion is denied. Cain's expert examination was offered in evidence at the Civil Service Commission hearing. Moreover, the defendants had adequate notice that the plaintiff might possibly rely on Cain's report as he was listed on the plaintiff's witness list in this case and was disclosed again in a letter dated October 16, 1998 from Cignetti's counsel to defense counsel after defense counsel had indicated that they might not assent to Aschkenasy as an expert.

July 1994, Cahill at Fitzgerald's request made copies of the original recording. Those copies were then forwarded to the attorneys preparing for the Civil Service hearing.

Moreover, while the record reveals that Fitzgerald directed Cahill to make the tape recording, there is absolutely nothing in the record that indicates that Fitzgerald requested that the tape be altered or supervised Cahill in making the tape. The record contains no evidence that Healy, Gardner, Ellis or Gelinas had anything to do with the tape or with supervising Cahill.

Moreover, Cignetti's allegation that Fitzgerald referred to him as a "complainer" and a "malcontent" is insufficient to support an inference that Fitzgerald authorized, approved, or knowingly acquiesced in the falsification of evidence. *See Alioto v. City of Shively*, 835 F.2d 1173, 1175 (6th Cir.1987) (holding that supervisory liability under § 1983 requires a showing that the "supervisory official at least implicitly authorized or approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate").

Furthermore, the record contains no evidence that Cahill was motivated by a desire to retaliate for the protected speech. At the time he prepared the tapes, Cahill was not a Fire Department employee and was not familiar with the substance of the disciplinary charges. *See e.g., Rubinovitz v. Rogato*, 60 F.3d 906, 911 (1995) (granting summary judgment on § 1983 First Amendment retaliation claim due to insufficient evidence to support an inference that allegedly retaliatory actions were motivated by the protected speech).

■ Cignetti's related claim that the defendants violated his civil rights by allowing the master tapes to be reused and thereby permitting exculpatory evidence to be destroyed is similarly unsubstantiated. The February 18, 1994 letter from Gardner to Attorney Lichten, which states that "[n]o tapes ha[d] been copied," that "[t]ape

copying [wa]s expensive and time consuming," and that "[n]o tapes [we]re available [then]" is not evidence that the master tape was in existence at the time the letter was written. Nor is there any evidence that anyone at the CFD or working for the City intentionally destroyed the master tapes. Rather, the record establishes that in July 1993 communications to and from Fire Alarm were recorded on 24–hour reel-to-reel multi-track tapes, that there were approximately 26 to 28 of these multi-track tapes, and that each was re-used every 26 to 28 days. Accordingly, it is undisputed that the tapes were merely reused in the normal course of business after Cahill had prepared the composite tape.

■ The claim that Gelinas preferred baseless disciplinary charges against Cignetti on July 12 is also entirely without support in the record. Cignetti makes much of the fact that Gelinas' second report contained allegations not present in his first report; namely that Gelinas had to order Cignetti to put the companies back in service twice before Cignetti complied. However, there is no evidence that Cignetti's protected speech played any part in Gelinas' initial decision to assert charges. *See Rubinovitz*, 60 F.3d at 906 ("[T]o survive summary judgment, the plaintiff must offer some proof that the defendants' allegedly retaliatory actions were motivated by the protected speech."); *cf. Angulo–Alvarez v. Aponte de la Torre*, (1st Cir.1999) (affirming grant of summary judgment to defendants because plaintiffs had failed to present any evidence from which one might infer that political affiliation was the substantial or motivating factor).

Rather, Gelinas' deposition and the text of his July 12 report demonstrate that his decision was not due to Cignetti's alleged disobedience, but was based on the fact that Cignetti took two companies out of service. In addition, Cignetti's own account shows that Gelinas was not acting in bad-faith. According to Cignetti, Ashe ini-

122

tially told Gelinas that he had told Cignetti that the order swap was approved by a Deputy. Cignetti further acknowledges that Ashe's statement was made on the spot to protect himself and was not in retaliation for Cignetti's protected speech.

■ Moreover, the record is completely lacking of any evidence that Fitzgerald in issuing the General Order was motivated by a desire to retaliate against Cignetti. General Orders are routinely issued when a firefighter is punished. Indeed, Attorney Rossman, who represented Cignetti at the July 26 hearing, testified that he expected a General Order. Moreover, even assuming that this particular order contained more detail than others, there is no evidence of bad-faith in connection with the order. In agreeing to the settlement offer, Cignetti accepted responsibility for the charges. That Fitzgerald had at one time allegedly referred to Cignetti as a "malcontent" and a "complainer" is not sufficient to create a triable issue of fact as to his motives.

■ Cignetti also complains that Fitzgerald deliberately excluded exculpatory evidence in material sent to Healy after Cignetti repudiated the settlement. He points out that the package of material did not contain his written accounts of either event, Murphy's report, the report filed by Ashe, or the reports obtained from Lieutenants Scott and Harkins, who both witnessed the disagreement between Cignetti and Ashe on July 7. Nevertheless, a review of the actual contents of the forwarded material does not raise an eyebrow of suspicion. In fact, the package contained all of the operative papers relevant to the charge, that is, Gelinas' initial report, which led to the formal assertion of charges, through the findings set forth in the General Order and letters of appeal. Although Cignetti's report was not attached, neither was Ashe's. As for Murphy's report and the reports by Scott and Harkins, they were not filed until after the date of transmittal.

Moreover, there is no support in the record for Cignetti's allegation that Healy and Gardner greatly "expanded" the penalty Cignetti faced in retaliation for his public statements that were critical of them. In fact, Rossman testified that he and Cignetti understood that having repudiated the settlement Cignetti faced potentially greater discipline than he would have received under the settlement agreement negotiated by Rossman.

Cignetti's suggestion of witness tampering is similarly without support. Indeed, he does not actually allege that Reardon (who is no longer a defendant in this suit) attempted to improperly influence Lieutenant Robert Fitzgerald. He merely submits that prior to the hearing Reardon spoke with Lieutenant Fitzgerald, who was prepared to testify at the hearing that Cignetti did in fact make the calls to Fire Alarm on July 13 that he was charged with not making.

■ Nor does the record substantiate Cignetti's assertion that the decision to withdraw Cignetti's limited duty assignment and return him to sick leave was related to his protected speech. At deposition, Gardner testified that it was the City's position that the collective bargaining agreement gave the City the option of requiring a firefighter on injured leave, who is capable of doing some work, to accept a limited duty position, but that the City had no obligation to provide a limited duty position in order to allow the employee to avoid using their sick time for non-work-related medical absences.

Moreover, Cignetti's allegations of continued harassment in connection with his work assignments and the scheduling of his vacation are also without support in the record. For example, as to Cignetti's limited duty position at Emergency Management, Rossman, who negotiated the arbitration settlement pursuant to which Cignetti was placed on the limited position, testified that both he and Cignetti understood that Cignetti would not perform certain duties that had previously been part

of that position but that the Lieutenant who had previously held that position would continue to perform those duties. With regard to Cignetti's vacation group assignment grievance, Rossman testified that while representing Cignetti he did not learn of or observe anything that would indicate that the City's position on vacation group assignments was in any way related to or in retaliation for positions Cignetti had taken either as a union member or as a citizen of Cambridge.

Cignetti has also failed to present any evidence suggesting that Fitzgerald, Ellis, and Gelinas are retaliating against him for his exercise of his First Amendment rights in not considering him for promotion to Deputy Chief. Their position that Cignetti is not qualified for the deputy chief position because he is on limited duty was corroborated by Rossman's testimony. Rossman explained that a firefighter on limited duty is not qualified for the deputy chief position because the job includes supervision of fire suppression activities which, under the collective bargaining agreement, limited duty personnel may not perform.

Furthermore, although direct evidence of a conspiracy is not necessary to survive a motion for summary judgment, *see Hampton v. Hanrahan*, 600 F.2d 600, 620 (7th Cir.1979), *rev'd in part on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980), and all inferences should be drawn in favor of the non-moving party, there is absolutely no support in the record for Cignetti's claim that the each of the defendants participated in a conspiracy in violation of his civil rights. "To demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was 'a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'" *Hampton*, 600 F.2d at 621; *see also Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir.1988); *Aubin v. Fudala*, 782 F.2d 280, 286 (1st Cir.1983).

The record here is devoid of any direct evidence of an agreement or plan by the defendants to prevent Cignetti's advancement or continued employment in the CFD. Moreover, there is insufficient circumstantial evidence for a reasonable jury to infer that such an agreement or plan among the defendants existed. For example, Cignetti's bald assertion that it is "not credible that Cahill acted alone" in preparing the false composite tape evidence is merely speculation. It does not justify submission of the issue to a jury. *See Russo v. Baxter Healthcare Corp.*, 140 F.3d 6, 8 (1st Cir.1998) (internal citations omitted) ("[T]he plaintiff must provide more than a mere scintilla of evidence and may not rely on conjecture or speculation to justify the submission of an issue to the jury."); *see also Slotnick v. Garfinkle*, 632 F.2d 163 (1st Cir.1980) (affirming dismissal of claims because plaintiff did not substantiate its bald claims of conspiracy).

Finally, Cignetti's claim that "[e]ven absent free speech considerations" the defendants have violated his substantive due process right to be free from arbitrary and capricious actions in his employment is without merit. *Newman v. Commonwealth of Massachusetts*, 884 F.2d 19, 24–25 (1st Cir.1989), on which Cignetti relies, recognized the existence of a substantive due process right in the case of tenured professors. However, Cignetti is a government employee and does not enjoy the same form of employment security.

Moreover, the First Circuit has stated that "charges that substantive due process was denied cannot rest on conclusory allegations or rhetoric alone (even impassioned rhetoric)." *Amsden v. Moran*, 904 F.2d 748, 757 (1st Cir.1990). To make out such a claim, the plaintiff must show a due process deprivation of constitutional dimension which must be so "shocking or violative of universal standards of decency . . . as to transgress . . . federal constitutional rights." *Id.* (internal citations omitted). Cignetti has not alleged any conduct

that would rise to a violation of these proportions.

Lastly, in *County of Sacramento v. Lewis*, the Supreme Court ruled that "where a particular amendment [of the Constitution] provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." 523 U.S. 833, 842, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (quoting *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)). Here, Cignetti's claims are essentially that he was retaliated against for exercising his right to free speech on matters of public concern. Thus, his "substantive due process" claim falls within the framework of a First Amendment retaliation claim. Accordingly, because the First Amendment provides an explicit textual source of constitutional protection, his substantive due process claim is not viable. *See e.g., Martineau v. Kurland*, 36 F.Supp.2d 39, 44–45 (D.Mass.1999).

### 2. *Massachusetts Civil Rights Act*

To recover under the Massachusetts Civil Rights Act (the "MCRA"), Mass. Gen. L. ch. 12, §§ 11H, 11I, a plaintiff must prove that his exercise or enjoyment of rights secured by the Constitution or laws of the United States or the Commonwealth has been interfered with, or attempted to be interfered with, and that the interference or attempted interference was by "threats, intimidation or coercion." *Bally v. Northeastern Univ.*, 403 Mass. 713, 717, 532 N.E.2d 49 (1989) (quoting Mass. Gen. L. ch. 12, §§ 11H and 11I). The Massachusetts Supreme Judicial Court has held that a "threat" is "an intentional exertion of pressure to make another fearful or apprehensive of injury or harm;" that "intimidation" is the "putting [of someone] in fear for the purpose of compelling or deterring conduct;" and that "coercion" is an "application to another of such force, either physical or moral, as to constrain him

to do against his will something he would not otherwise have done." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474, 631 N.E.2d 985 (1994) (citations omitted). It has further explained that "an actual or potential physical confrontation accompanied by a direct threat of harm" will suffice to establish "threats, intimidation or coercion" in violation of the MCRA. *Bally*, 403 Mass. at 719, 532 N.E.2d 49.

Cignetti alleges that the defendants and their agents "threatened" him on several occasions in an effort to chill, and as punishment for, his exercise of his First Amendment rights to speak on matters of public concern. In particular, Cignetti claims that his vocal opposition to developing the Grace site prompted several threats from City Manager Healy, through his Deputy, Richard Rossi. One such instance, Cignetti avers, occurred in December 1992 at a Health and Welfare Fund holiday dinner. Cignetti maintains that he refused to discuss the Grace site with Rossi and Rossi replied, "I should shoot you or better yet get Mike to shoot you," referring to Mike Costello, a Vietnam veteran, who was sitting next to Rossi. In addition, Cignetti testified at his deposition that during the domestic partnership debate at a Health and Welfare Fund trustee meeting (while the disciplinary proceeding against Cignetti was underway), Rossi warned him that his rank and position with the Fire Department were "uncertain." Cignetti further alleges that, on June 3, 1993, Deputy Chief Ellis threatened to transfer him as a result of his disagreements with Fitzgerald and Ellis over Fire Department matters relating to public safety.

Healy, Fitzgerald and Ellis argue that Cignetti's MCRA claim fails because he has not established that his rights were interfered with by means of "threats, intimidation or coercion" as required by Massachusetts law. As support, they assert that Cignetti has adduced no evidence of "threats of physical violence."

Cignetti counters that the "threats" made by Rossi and Ellis amount to "threats, intimidation or coercion" within the meaning of the MCRA. Relying on *Broderick v. Roache*, 803 F.Supp. 480, 486–87 (D.Mass.1992), he asserts that a "threat of physical violence" is not necessary to establish "threats, intimidation or coercion" for purposes of the MCRA, but that a scheme of harassment is sufficient.

■ The defendants are correct that there is no evidence on the record of "threats of physical violence." Neither the remark by Rossi that Cignetti's rank and position were "uncertain" nor the alleged "threat" of transfer by Ellis involve "potential physical harm." In addition, while Cignetti's allegations with respect to Rossi's statement, "I should just shoot you," were sufficient to withstand the motion to dismiss on the ground that it involved "potential physical harm," *Cignetti*, 967 F.Supp. at 17, the record after discovery demonstrates that the statement does not rise to the level of "threats, intimidation or coercion" within the meaning of the MCRA. Rossi testified that the statement was made jokingly. Rossi's description is corroborated by Cignetti's own deposition testimony. Cignetti did not dispute that the statement was said in jest and admitted that he did not take it seriously.

■ Moreover, that Cignetti found the remark "intimidating" is irrelevant. The nature of a "threat" should be examined from an objective standpoint. *See Blake*, 417 Mass. at 474–75, 631 N.E.2d 985 (quoting *Commonwealth v. DeVincent*, 358 Mass. 592, 593, 266 N.E.2d 314 (1971)) ("[T]he state of mind of the person threatened is not controlling."). Therefore, Cignetti's apprehension, given the context in which this "threat" occurred, was not reasonable.

Furthermore, even applying the "scheme of harassment and retaliation" standard set forth in *Broderick v. Roache*, the defendants are still entitled to summary judgment. As discussed above in connection with Cignetti's claims under § 1983, the evidence adduced during discovery is not sufficient for a reasonable jury to find that the defendants were motivated by a retaliatory animus against Cignetti in violation of his First Amendment rights. *See e.g., Murphy v. Town of Duxbury*, 40 Mass.App.Ct. 513, 665 N.E.2d 1014, *review denied*, 423 Mass. 1105, 668 N.E.2d 356 (1996) (affirming grant of summary judgment on MCRA claim for lack of proof as there was no evidence that the Town officials were motivated other than by desire to enforce their interpretation of zoning laws).

■ In addition, Cignetti's claim against Healy fails because it is based solely on a theory of vicarious liability. Cignetti does not allege that Healy threatened him directly, but asserts that the "threats" allegedly made by Rossi can be attributed to Healy because Rossi was Healy's agent. However, nothing in the record indicates that Rossi was acting at Healy's direction or that Healy authorized or approved Rossi's alleged "threats." *Cf. Alioto*, 835 F.2d at 1175 (holding supervisory personnel liable for § 1983 violations "only where evidence establishes that they authorized or approved the unconstitutional conduct").

The MCRA claim against Fitzgerald also fails because discovery has not produced any evidence of threats made by Fitzgerald. Moreover, to the extent the claim against Fitzgerald is founded on Ellis' alleged "threat" of transfer, Fitzgerald cannot be held accountable for Ellis' conduct on a theory of vicarious liability under the MCRA (as discussed above) and there is no evidence that Ellis was acting at Fitzgerald's direction.

### 3. *Abuse of Process*

■ In Massachusetts, the elements of a claim for abuse of process are: (1) that "process" was used, (2) for an ulterior or illegitimate purpose, and (3) which resulted in damage. *Jones v. Brockton Public Markets, Inc.*, 369 Mass. 387, 390, 340

N.E.2d 484 (1975) (discussing criteria in context of motion to dismiss).

Healy and Fitzgerald assert that they are entitled to summary judgment on Cignetti's abuse of process claims. They submit that the disciplinary hearing cannot constitute "process" for the purpose of an abuse of process claim. They also contend that Cignetti's claim fails because Cignetti has not adduced evidence sufficient to permit a finding that either of them used process for an "ulterior" purpose.

The defendants' first argument is without merit. It is the law of this case that the tort of abuse of process applies to the Civil Service Commission hearing. This Court determined in the decision on the motion to dismiss that "a reasonable argument can be made that the Civil Service hearing constitutes such process," because the proceeding "compelled the parties to submit to the jurisdiction of the Civil Service Commission, to retain counsel, to provide testimony, and to abide by the decision of the ALJ." *Cignetti*, 967 F.Supp. at 18.

■ Nevertheless, the defendants prevail because Cignetti's abuse of process claims against Healy and Fitzgerald fail for lack of proof. There is insufficient evidence on this post-discovery record for a reasonable jury to infer that Healy and Fitzgerald were motivated by an improper or malicious purpose in subjecting Cignetti to disciplinary charges. That the defendants informed Cignetti after he repudiated the settlement that he could be subject to greater discipline does not demonstrate that the existence of genuine issues of material fact as to whether the disciplinary proceeding was utilized for an "ulterior" purpose. In fact, Healy and Fitzgerald both testified that Cignetti's actions in taking two companies out of service on July 7, and to a lesser extent his failure to relieve on July 13 constituted poor judgment on the part of a fire captain, exposed not only the City of Cambridge but neighboring cities and their firefighters to danger and were, in their opinion, sufficiently serious

to warrant disciplinary action against Cignetti. Rossman's deposition testimony corroborates this view. He testified that Fitzgerald was genuinely angry and embarrassed by Cignetti's actions. There is simply no evidence that Healy or Fitzgerald pursued disciplinary charges against Cignetti for any other purpose.

### 4. *Libel*

■ Although Fitzgerald does not enjoy absolute immunity for the General Order, summary judgment in favor of Fitzgerald on Cignetti's libel claim is warranted. To establish a claim for libel, a plaintiff must prove: (1) a defamation, (2) of and concerning the plaintiff, (3) made public, (4) that the defamation was false, and (5) that plaintiff was damaged as a result. *Peck v. Wakefield Item Co.*, 280 Mass. 451, 454, 183 N.E. 70 (1932).

■ In the decision on the motion to dismiss, this Court ruled that statements contained in the General Order were statements of fact and not statements of opinion and therefore could form the basis of a defamation claim against Fitzgerald. Notwithstanding this conclusion and even assuming the statements themselves are false, Fitzgerald statements are protected by a conditional privilege. Statements made within the context of an employment relationship by and to a plaintiff's supervisor or coworkers are conditionally privileged if the speaker reasonably believed that his statements were true and acted in good faith. Nolan, *Tort Law*, § 130 at 210. To overcome that privilege, the burden is on the plaintiff to show abuse of the privilege or that the statements at issue were made with malice. *Id.* § 130 at 216–219.

Cignetti has adduced no evidence that Fitzgerald abused the privilege by acting recklessly in publishing the General Order. In agreeing to the settlement, Cignetti in fact admitted the facts underlying the charges against him. *Cf. Mendez v. M.S. Walker, Inc.*, 26 Mass.App.Ct. 431, 528

N.E.2d 891 (1988) (upholding jury verdict against employer on grounds that recklessness could be inferred from failure to verify).

■ Nor is there any evidence that Fitzgerald publication of the General Order was done maliciously. Cignetti seems to suggest that malice can be inferred from the fact that this particular General Order deviated from ordinary department procedure. He points to Lieutenant Robert Fitzgerald's testimony that General Orders typically have the name of the offender and the rule number of the offense, making them incomprehensible to most readers. He also relies on Rossman's deposition testimony that while he expected a General Order to issue, the detail in this particular order was much more extensive than he had anticipated. Nevertheless, that this particular General Order contained extensive factual detail which may have deviated from ordinary department procedure does not establish a question of material fact as to malice.

### IV.

In sum, although absolute immunity does not altogether bar Cignetti's suit, Cignetti has failed to adduce sufficient evidence of each of his claims to withstand summary judgment. The individual defendants' motion for summary judgment is granted.

It is so ordered.